RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0393p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GENERAL MOTORS CORPORATION and AM
GENERAL, LLC,

　　　　　　　　　　　　　*Plaintiffs-Appellees,*

　　　　*v.*

LANARD TOYS, INC. and LANARD TOYS LIMITED,
　　　　　　　　　　　　　*Defendants-Appellants.*

No. 05-2085

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 01-71103; 03-72731—Arthur J. Tarnow, District Judge.

Argued: July 19, 2006

Decided and Filed: October 25, 2006

Before: MARTIN and RYAN, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** John A. West, GREENEBAUM DOLL & McDONALD, Cincinnati, Ohio, for Appellants. Mark A. Cantor, BROOKS & KUSHMAN, Southfield, Michigan, David R. Pruitt, BAKER & DANIELS, South Bend, Indiana, for Appellees. **ON BRIEF:** John A. West, GREENEBAUM DOLL & McDONALD, Cincinnati, Ohio, William T. Robinson III, Carrie Anne Shufflebarger, GREENEBAUM DOLL & McDONALD, Covington, Kentucky, for Appellants. Mark A. Cantor, Marc Lorelli, BROOKS & KUSHMAN, Southfield, Michigan, David R. Pruitt, Edward A. Sullivan, Gerard T. Gallagher, BAKER & DANIELS, South Bend, Indiana, for Appellees.

　　　　MARTIN, J., delivered the opinion of the court, in which MARBLEY, D. J., joined. RYAN, J. (p. 13), delivered a separate concurring opinion.

_____

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

---

**OPINION**

---

BOYCE F. MARTIN, JR., Circuit Judge. The district court, in a trademark and trade dress infringement suit filed against Lanard Toys by General Motors Corporation, granted summary judgment for General Motors on its claims while denying Lanard's motion for summary judgment based on the affirmative defenses of laches and estoppel. Lanard now appeals those decisions. The dispute is over a series of toy vehicles produced by Lanard called "THE CORPS! ATK" which resemble the Hummer vehicle produced by General Motors. Based on the following discussion, we affirm the district court's decisions.

I.

*A. Development of Hummer*

In the 1980s, the United States government commissioned AM General to produce a high mobility military vehicle. The result was called the High Mobility Multi-Wheeled Vehicle or HMMWV, which was commonly referred to as the "Humvee." After garnering recognition through its use in the first Gulf War, AM General decided to introduce a civilian version of the Humvee in 1992, known as the Hummer. The design of both the Humvee and Hummer included a front grille with seven vertical pill-capsule shaped slots, bookended by round headlights of approximately equal size to the slots. AM General received a registered trademark for the grille design on March 5, 1996. AM General never sold more than 900 Hummers in any calendar year from 1992 to 1999, in part due to a price tag of over $100,000. In December of 1999, AM General transferred the Hummer brand to General Motors as well as all intellectual property rights in the civilian vehicle while maintaining all rights in the Humvee name and the military vehicle. After the transfer, General Motors created the H2, a smaller version of the Hummer.

*B. Lanard's Interactions with the Humvee/Hummer brands*

In 1992, Lanard Toys, Inc. began selling a toy vehicle called the "MUDSLINGER." It was modeled after the Humvee military vehicle, including a similar grille design to that of the Humvee. The box for the MUDSLINGER labeled the toy as a "Hyper Humvee." Lanard's sales records show that the MUDSLINGER had limited sales between 1992 and 1996, including no sales for the years of 1994 and 1996. In July 1993, AM General contacted Lanard regarding the use of their trademarked name of "Humvee" on its toys. After correspondence between the two parties, Lanard agreed to stop using the "Humvee" name on its toys, but continued to manufacture the MUDSLINGER toy. There is dispute between the parties as to whether Lanard agreed with AM General that Lanard could continue to manufacture MUDSLINGER toys.

In February 1997, Lanard contacted AM General regarding putting the "Humvee" name back on its toys. Lanard, at the time, was producing a number of military vehicle toys, including the "THE CORPS! ATK" vehicle at issue in this case. The ATK vehicle has a similar design to that of the MUDSLINGER vehicle. In response to Lanard's letter, AM General sent a cease-and-desist letter to Lanard to stop using all of AM General's trademarks. Lanard responded by stating that it did not use either the Hummer or Humvee names on its packaging.

In November 1998, AM General sent a demand letter to Lanard regarding the ATK vehicle's "nose design." Lanard responded by refusing to comply with the demand to stop producing the toy. In November 2000, General Motors contacted Lanard to inform it that Lanard's military toy vehicles infringed on the Hummer vehicle produced by General Motors. Lanard again rejected that

contention and continued to produce its toys.  On March 20, 2001, General Motors filed suit claiming that Lanard's toys infringed on its rights to the Hummer vehicle and grille design.

*C.  Procedural History*

General Motors's complaint alleged that Lanard's toys infringed on its Hummer vehicle and grille design, resulting in trademark infringement, trade dress infringement, dilution, and common law trademark infringement.  On July 16, 2003, Lanard filed a complaint against AM General seeking a declaratory judgment as to AM General's rights in the Humvee vehicle and grille design.  AM General, on September 29, 2003, filed a counterclaim against Lanard for infringement on its Humvee trade dress.  In April 2004, all parties moved for summary judgment and the district court granted summary judgment for AM General and General Motors on their trade dress and trademark infringement claims.  The district court dismissed all of Lanard's defenses except for laches and estoppel.

From March 8 to 10, 2005, a jury trial was held on damages and the issue of laches and estoppel.  The jury awarded damages to General Motors as an eight percent royalty on sales of the ATK ($340,330), plus over $900,000 from Lanard's profits.[1]  Acting in an advisory capacity, the jury denied Lanard's laches and estoppel defenses.  Lanard filed a timely appeal to this Court on August 10, 2005.

II.

*A.  Summary Judgment Standard*

This Court reviews a district court's decision to grant summary judgment de novo.  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).  Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by 'showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Bennett*, 410 F.3d at 817 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.  Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "Thus, the facts and any inferences that can be drawn from those facts, must be viewed in the light most favorable to the non-moving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

*B.  Trademark Infringement Claim*

To demonstrate trademark infringement, the plaintiff must show that the use of the allegedly infringing trademark "is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997) (citing 15 U.S.C. § 1114).  In order to determine confusion, this Court examines the eight so-called *Frisch* factors: "(1) strength of the plaintiff's mark, (2) relatedness of the goods or services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) the defendant's intent in selecting its mark, and (8) likelihood of expansion of the product lines." *Gibson Guitar*

---

[1]The district court added pre-judgment interest, resulting in total damages of $1,523,840.53 plus post-judgment interest.

*Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 548 (6th Cir. 2005) (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982), *cert. denied*, 459 U.S. 916 (1982)). "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Id.* (citing *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). As we have noted:

> This Circuit considers the question of whether there is a likelihood of confusion a mixed question of fact and law. Factual findings must be made with respect to the likelihood of confusion factors set out above. However, the further determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion. Because this case is presented to us after a grant of summary judgment, our task is to determine whether the District Court correctly held that no genuine issues of material fact were presented regarding the likelihood of confusion factors.

*Id.* at 548 n.11 (citing *Homeowners Group*, 931 F.2d at 1107).

#### 1. *The District Court's Treatment of the* Frisch *Factors*

The district court held that Lanard's ATK vehicle grille design infringed on the Hummer Nose Design trademark (Trademark No. 1,959,544). Lanard's primary objection to the summary judgment against them on the infringement of the '544 trademark was the failure by the district court to discuss any of the *Frisch* factors in its judgment. "[N]ot all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted." *Daddy's Junky Music Stores*, 109 F.3d at 280. Lanard argues that no such "thorough and analytical treatment" was given to the trademark infringement claim in this case. General Motors[2] responds by noting that "[t]his Court reviews judgments, not opinions," *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 442 (6th Cir. 2004), and argues that "there is no need for a detailed analysis because all factors favor a likelihood of confusion." Despite General Motors's contention, Lanard's argument appears to be a correct one.

*Daddy's Junky Music Stores* advises a court to conduct a "thorough and analytical treatment" of the *Frisch* factors. The district court may have conducted such a treatment, but it has given no indication of its analysis and what reasoning it used to arrive at its conclusion in either its order, or the transcript of the summary judgment hearing. This leaves a reviewing court little to work with in determining whether the trademark infringement claim was deserving of judgment as a matter of law. *Daddy's Junky Music Stores* requires that the district court make express factual findings as to the *Frisch* likelihood-of-confusion factors. 109 F.3d at 280. With that said, the district court erred in not conducting a proper discussion of the *Frisch* factors. However, because we review a summary judgment motion de novo, the district court's silence is not, standing alone, a reversible error and we must now conduct a de novo review of the likelihood-of-confusion factors.

#### 2. *Likelihood of Confusion*

As discussed *supra*, there are eight likelihood-of-confusion factors which we must weigh to determine confusion and, therefore, trademark infringement. Upon review of the record, we find there to be sufficient evidence to grant summary judgment in favor of General Motors on the issue of a likelihood-of-confusion. The "strength of the mark" factor heavily favors General Motors, as the trademark in question has been federally registered and General Motors places the grille of a

---

[2]General Motors and AM General present a unified front in responding to Lanard's appeal. Therefore, we will refer to both of the Plaintiffs in this case as General Motors. Where necessary, we will distinguish between AM General and General Motors.

Hummer prominently within a number of its advertisements for the vehicle. The "similarity of the marks" and the "defendant's intent in selecting the mark" both heavily favor General Motors, as there is undisputed evidence that the design of the front grille of Lanard's toys was copied directly from the Hummer vehicle. Also, the "likely degree of purchaser care" favors General Motors, as the product in question is a series of toys. It is highly unlikely that a child or adult, in the selection of a toy, will carefully evaluate whether the Hummer-like vehicle is actually from the maker of Hummer or another source of goods. They will merely recognize the grille shape, recognize the general shape, and purchase based on that recognition. The "relatedness of the goods and services" also weighs in favor of General Motors, as the toy car is quite closely related to the actual car on which the registered trademark of the grille is found. The factors of "marketing channels used" and "likelihood of expansion of product lines" do not strongly favor either party in this case. There appears to be no evidence of how the marketing for either product might overlap, and while General Motors states it has considered making Hummer toys, there is no real proof that the company is seriously considering this possibility.

The only remaining factor is that of "evidence of actual confusion." Lanard argues that a survey used by General Motors to demonstrate actual confusion was actually focused on the overall vehicle's trade dress, not the trademark in the grille, an assertion which General Motors concedes. The only proof of actual consumer confusion presented by General Motors is a K-Mart purchase order form and a screen-shot from Amazon.com's Toys "R" Us section, both of which list Lanard's toys as "Humvees." What General Motors fails to acknowledge is that the mere use of the Humvee name by retail stores does not inherently mean that Lanard has infringed on the trademark of the *grille design* or that the grille design itself is the reason for the confusion. As General Motors must acknowledge, the confusion by K-Mart or Toys "R" Us could stem from the overall exterior of the toys and not necessarily from the grille design. In order to prove actual confusion, the confusion must stem from the mark in question – in this case, the grille design. Given the uncertainty in this evidence, we hold that the "evidence of actual confusion" factor does not favor either party, although neither would this factor be determinative on the overall issue of the likelihood-of-confusion. *See Daddy's Junky Music Stores*, 109 F.3d at 284 ("Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant."). In sum, the weight of the factors in favor of a finding a likelihood of confusion convinces us that summary judgment was appropriate in this case, despite the district court's failure to adequately discuss the *Frisch* factors.

## C. Trade Dress Claim

Trademarks and trade dress are separate and distinct causes of action under the Lanham Act, 15 U.S.C. § 1050 *et seq. Gibson Guitar*, 423 F.3d at 547. Trade dress has been described by the Supreme Court as the "'design or packaging of a product' which has acquired a 'secondary meaning' sufficient 'to identify the product with its manufacturer or source.'" *Id.* (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001)).

> Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, [that] make[s] the source of the product distinguishable from another and . . . promote[s] its sale. Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.

*Id.* at 547 n.10 (internal citation omitted).

A party seeking to recover for trade dress infringement must prove by a preponderance of the evidence that (1) the trade dress is not functional; (2) the trade dress is distinctive in the marketplace and has acquired "secondary meaning," thereby indicating the source of the goods; and

(3) the trade dress of the accused product is confusingly similar. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). Lanard is silent on the issue of whether the trade dress of its toys is confusingly similar to the trade dress asserted by General Motors and AM General. This silence is taken as a concession of this element of trade dress infringement. We must therefore review de novo whether there was a material issue of fact as to each of the remaining two elements. The district court held that Lanard's "CORPS! ATK" vehicle violated the Hummer/Humvee trade dress as a matter of law.

### 1. *Elements and Ownership of Trade Dress*

Before addressing the application of the trade dress infringement elements, we must first address Lanard's challenge to both the ownership of the Hummer and Humvee trade dress and what that trade dress is comprised of. Lanard's argument can be summed up in two statements. First, neither the district court, AM General, nor General Motors listed the appropriate elements constituting the protected trade dress. Second, the district court inappropriately lumped together the trade dress of the civilian Hummer vehicle (owned by General Motors) with the military Humvee vehicle (owned by AM General), thereby prejudicing many of Lanard's arguments against trade dress infringement.

"[I]t will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list." MCCARTHY ON TRADEMARKS § 8:3 (4th ed. 2001). General Motors argues that the trade dress was properly identified as the "exterior appearance and styling" of the vehicles in question. However,

> focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market.

*Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997). General Motors argues that it met that burden in its summary judgment brief when it identified the trade dress elements as "the exterior appearance and styling of the vehicle design which includes the grille, slanted and raised hood, split windshield, rectangular doors, squared edges, etc." While the district court did not repeat this list as the specific trade dress which Lanard infringed upon, we hold this is sufficient to fulfill the "discrete elements" requirement of a trade dress claim.

Lanard's only dispute that this description by General Motors is not an acceptable list of "discrete elements" involves the "etc." at the end of the description. In requiring a list of "discrete elements," we are looking to avoid "vague and indeterminate references to the 'overall appearance' or 'look' of plaintiff's packaging." MCCARTHY ON TRADEMARKS § 8:3. In the end, the question is whether or not "the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement." *Id.* Based on the list of elements presented by General Motors, it can be understood exactly what they are looking to protect. The "etc." marking must be ignored in such a listing as it does not define any further element to be included in the trade dress. *See* WILLIAM STRUNK, JR. & E.B. WHITE, THE ELEMENTS OF STYLE 46 (4th ed. 2001) ("In formal writing, *etc.* is a misfit."). Because the listing is not vague and provides exact details as to what General Motors seeks to protect, we find the elements listed by General Motors to be sufficient to define exactly what constitutes the Hummer/ Humvee trade dress.

Lanard's second argument is that the district court treated the trade dress claims from AM General and General Motors as the same. The district court referred in its summary judgment order

to the "Hummer/Humvee Trade Dress" as the trade dress on which the ATK vehicle infringed. The two plaintiffs also combined the trade dress claims of the Hummer and the Humvee throughout their summary judgment brief and subsequent reply brief. However, the design elements of each are not identical, as admitted to by an AM General representative: "The HUMVEE contains certain design elements not present on the Hummer, including, but not limited to: 'X'-shaped cross bars on the doors, a slant back with no windows, mounted weapons or a weapons turret, and a blackout headlight in the left front hood recess." While these distinctions appear to be significant changes to the "exterior appearance and styling," they do not change the basic trade dress as defined by the discrete elements listed above. Both the military Humvee and the civilian Hummer share common appearance elements which constitute a trade dress (specifically, the grille, slanted and raised hood, split windshield, rectangular doors, and squared edges). The elements listed which were not a part of the civilian Hummer's design are also not listed in the discrete elements which make up the trade dress as alleged by General Motors/AM General. Therefore, the district court's combining of the Hummer and Humvee trade dresses into one trade dress comprising the common elements between those vehicles is permissible.

2. *Functionality of Trade Dress*

Lanard also challenges whether the protected trade dress in this case is actually non-functional, claiming that as a functional feature, it cannot be protected under trade dress law. *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). A trade dress's non-functional nature must be proven by the party asserting the trade dress protection. 15 U.S.C. § 1125(a)(3); *TrafFix*, 532 U.S. at 29.

> [A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.

*Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165 (1995) (internal quotation marks omitted). If a trade dress is found to be functional, the mere fact that there are other non-infringing designs which would serve the same functional purpose is no defense to functionality. *Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 155 (6th Cir. 2003).

Lanard's first objection to the district court's ruling on this issue is the court's clear misunderstanding of the role of functionality in a trade dress claim. The district court, in its order, stated that "Lanard's defense of 'functionality' is dismissed." This demonstrates an inappropriate shifting of the burden on the issue of functionality from General Motors to Lanard. The district court erred in its labeling of the issue of functionality as a defense to be proven by Lanard, instead of requiring General Motors to prove the absence of functionality as an element of trade dress infringement. However, this error is not reversible, and we must continue our de novo review of the issue in order to determine if General Motors has proven its trade dress to be non-functional.

General Motors, in proving non-functionality, relies heavily on the declaration of Mr. Robert Gula, Senior Vice President of Engineering and Product Development for AM General. Gula testified that the appearance of the Humvee was unrelated to its function, stating that "AM General's prototype [of the Humvee] could have had a different appearance and still functioned the same way" and that the appearance was "not essential to the use or purpose of the vehicle." However, Gula's first statement is insufficient evidence for non-functionality as the mere existence of other potential designs is no defense to a design's functionality. *Antioch*, 347 F.3d at 155. What remains is Gula's statement that the appearance and styling was "not essential to the use or purpose of the vehicle."

Lanard counters General Motors's proof on this issue by quoting from Gula's deposition testimony in which he stated "[t]he shape [of the Humvee] was basically a byproduct of a vehicle that was designed to meet a performance specification." Gula continued to testify that part of those performance specifications were "dimensional limitations, maximum width, maximum height, maximum overall length. [The Army] dictated approach and departure angle and I think breakover angle." These performance-based specifications all seem to directly affect the "exterior appearance and styling" of the Humvee. However, Gula later stated in his declaration that "The Government's technical specification did not address the exterior appearance or the styling of the vehicle."

We conclude that General Motors must prevail on the issue of functionality. The trade dress in question has been defined as "the exterior appearance and styling of the vehicle design which includes the grille, slanted and raised hood, split windshield, rectangular doors, squared edges, etc." We fail to see what function these elements perform. While we understand that General Motors bears the burden of proof of non-functionality, the plain appearance of the vehicle shows that the elements which comprise its trade dress are inherently non-functional. The statement by Gula regarding "performance specifications," which was relied upon by Lanard, does not contribute to what makes up the Hummer/Humvee trade dress. In fact, General Motors has managed to significantly alter the height, width, and length of the Humvee in creating its newer models of the Hummer while maintaining the same trade dress as the original military vehicle. The military undoubtedly had function in mind when designing the Humvee. However, this does not necessarily mean that the exterior appearance and style was based on function; rather, it was more likely an unrelated afterthought.

Lanard repeatedly and dramatically stated during oral argument that it stakes its entire claim in this case on the issue of functionality. Unfortunately, this was like picking a show pony in a thoroughbred race. The district court was correct in holding that the Hummer/ Humvee trade dress is non-functional.

### 3. *Secondary Meaning*

Finally, Lanard argues that an issue of material fact remains as to whether the allegedly protected trade dress has acquired secondary meaning. Again, General Motors bears the burden of proof on the issue of secondary meaning. *Wal-Mart Stores*, 529 U.S. at 210. To demonstrate secondary meaning, the evidence must show that "in the minds of the public, the primary significance of the trade dress is to identify the source of the product rather than the product itself." *Inwood Labs*, 456 U.S. at 851 n.11. This Court applies a seven-factor test to determine whether secondary meaning exists in a trade dress: (1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying. *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 937 (6th Cir. 2000), *rev'd on other grounds*, *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001).

Lanard first argues that the district court erred in not applying the seven-factor test or referring to any of the factors in either its decision or at the summary judgment hearing. Additionally, the district court appears to have incorrectly shifted the burden on this issue by stating that "Lanard's defense of 'secondary meaning' is dismissed." Secondary meaning is an element of trade dress infringement which must be proven by the plaintiffs, not the defendants. *Walmart Stores*, 529 U.S. at 210. On this issue, the district court erred in ruling against such a "defense" because Lanard is not required to present evidence on secondary meaning. That burden falls to General Motors. However, as this is de novo review, we must continue to apply the seven-factor test in order to determine if General Motors has sufficiently proven that the trade dress has acquired secondary meaning.

In order to prove secondary meaning, General Motors relies on a number of sources. First, it draws this Court's attention to a General Motors business report which states that Hummer has 96% brand recognition. The report, dated December 1, 1999, states that 96% of the 228 respondents were able to correctly identify a picture of the Hummer as in fact being a Hummer.[3] This survey appears to be powerful evidence in that it essentially forced consumers to look at the "exterior appearance and styling" and to identify the source of that product. General Motors also relies on a survey from 2002, conducted in anticipation of this litigation. This "Marylander survey" concluded that Hummer's trade dress had secondary meaning to almost 77% of the respondents, but its conclusion is slightly misleading. The 77% represents the number of people who, when they were showed pictures of Hummer vehicles, stated that a specific make comes to mind, including: Hummer (54%), Humvee (14%), General Motors (2%), Hoomer (1%), Hummer truck (1%), Military Hummer (1%), and those who could not name the make but knew they were all from one company (15%).[4] Nevertheless, knowledge that a product comes from a single source, even without naming that source, is sufficient to establish secondary meaning. *See* 15 U.S.C. § 1157.

Lanard argues that General Motors's survey evidence is not enough to establish secondary meaning. First of all, it argues that secondary meaning must be proven before the first allegedly infringing use of the trade dress. *See* MCCARTHY ON TRADEMARKS §15:4; *Burke-parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) ("Secondary meaning must be established prior to other's first use of a similar [design]."). Survey evidence from either 1999 or 2002 is therefore not relevant given that Lanard developed the MUDSLINGER in 1992 and the allegedly infringing ATK in 1997. General Motors retorts that such a blanket rule would invalidate all surveys of trade dress conducted in anticipation of litigation.

This Court has historically favored the use of consumer surveys as proof of secondary meaning. *See Tumblebus, Inc. v. Cramner*, 399 F.3d 754, 761 n.9 (6th Cir. 2005); *see also Black & Decker, Inc. v. Pro-Tech Power Inc.*, 26 F.Supp.2d 834 (E.D. Va. 1998) (holding that a 1998 survey showing 85% brand recognition was strong enough to establish secondary meaning in 1992). However, the question remains whether we should ignore all survey evidence conducted post-infringement or accept the evidence with the understanding that the survey does not reflect a pre-infringement world. A court may easily take into consideration the strength of recognition at the time of the survey in light of the amount of time passed between that date and the date of infringement. We have previously taken the latter course in an unpublished decision. *Ashland Oil v. Olymco*, 1995 U.S. App. LEXIS 24652 (6th Cir. August 21, 1995). This seems to be the appropriate choice, given the relatively unlikely scenario that a company has conducted a pre-infringement survey and this Court's strong support for survey evidence in evaluating secondary meaning. In light of the strong statistical evidence (96% recognition in 1999 and 77% recognition in 2002), we hold that General Motors's survey evidence was sufficient to support secondary meaning. *See Ashland Oil*, 1995 U.S. App. LEXIS 24652 at *9-13 (holding that 50% is generally acceptable for secondary meaning and 38% is marginal recognition).

Finally, there is a dispute between the parties over whether the intentional copying of a trade dress constitutes inherent secondary meaning in that trade dress. The Supreme Court has stated that "product-design trade dress can never be inherently distinctive." *Walmart Stores*, 529 U.S. at 214. Therefore, secondary meaning for any product design trade dress can not be inherent through evidence of copying. While Lanard believes the *Walmart* court completely eliminated consideration

---

[3] The survey respondents were looking at a picture of AM General's civilian Hummer vehicle, not AM General's military vehicle or General Motors's civilian Hummer vehicles.

[4] These numbers do not add up to 77% as respondents were allowed to name more than one make. The 77% named either one of those makes which the survey deemed "Hummer/GM Brands" or did not name a make but said they all came from one company.

of intentional copying in product design cases, that is not the case. Intentional copying may be used to show secondary meaning as the seventh factor in this Court's seven-factor test, but it is only one of many considerations in that test and does not alone establish secondary meaning. Therefore, Lanard's intentional copying of the Humvee trade dress is relevant, but not determinative, to the issue of secondary meaning.

We have now discussed two factors — consumer surveys and proof of intentional copying — of the seven-factor test required by *TrafFix Devices*. 200 F.3d at 937. Because we must focus on secondary meaning developed before infringement, General Motors has very little evidence as to the remaining five factors. Direct consumer testimony is unavailable pre-1992. There was little "exclusivity, length, and manner of use" of the trade dress pre-1992. There was no advertising, with the exception of the presence of the Humvee in the Gulf War. Finally, there was no sales and no established place in the market for the vehicles at that time. However, General Motors presents exceptionally strong survey evidence of recognition of its trade dress along with the intentional copying by Lanard. Lanard was unsuccessful in its attempt to discredit the proof offered by General Motors. Given this strong evidence by General Motors and Lanard's inability to present evidence to the contrary on any of the seven factors, we hold that summary judgment was appropriate as to the issue of secondary meaning.

General Motors therefore has established that there are no material issues of fact as to any of the three elements of trade dress infringement. Therefore, summary judgment was appropriate as to this issue.

### D. The Laches and Estoppel Defenses

Lanard's final appeal challenges the district court's decision denying Lanard summary judgment based on laches and estoppel defenses.[5] Laches is the "negligent and unintentional failure to protect one's rights." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002). To demonstrate a valid estoppel claim, Lanard "must show that it had been misled by [General Motors/AM General] through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark." *Id.* at 412. In its estoppel defense, Lanard relies on the "silence" and "virtual abandonment" requirements. Because the application of these related defenses here turns on AM General's silence and the potential abandonment of its claims, we will address both defenses together.

#### 1. *Summary Judgment Appeal Post-Jury Verdict*

Before we can reach the merits of the laches and estoppel defenses, we must be sure that an appeal of a summary judgment can be heard. After denying Lanard's motion for summary judgment on laches, the district court submitted the question of the laches and estoppel defenses to the jury and the jury rejected Lanard's defenses. We will generally not rule on an appeal of summary judgment if the issue went to trial. *Garrison v. Cassens Transport Co.*, 334 F.3d 528, 537 (6th Cir. 2003). However, an exception to that rule exists if the summary judgment was based on a pure question of law rather than on a material issue of facts, in which case this Court may review the summary judgment motion. *Paschal v. Flagstar Bank*, 295 F.3d 565, 572 (6th Cir. 2002). Although the district court did not provide an explanation for why it denied Lanard's motion for summary judgment on laches and estoppel, it subsequently submitted the question to the jury, thereby insinuating that there were questions of fact for the jury to answer. We thus reason from the district court's ruling that its denial of summary judgment was not based on a pure question of law, but on factual disputes over the elements of laches.

---

[5] It should be noted that the burden here shifts from the previous two appeals because in this appeal of summary judgment, Lanard was the moving party at the district court, while General Motors was the non-movant.

Lanard argues that the submission of the question of laches to a jury is irrelevant because the district court did so "in an advisory sense." Because the jury's determination on this issue was only advisory, Lanard argues, there was no jury verdict on the issue of laches and this Court may therefore hear the appeal. Based on this "advisory" jury determination, we agree. While a jury may be used to consider factual disputes in a laches defense, the fact that the jury was used in an advisory manner suggests that our review of the denial of summary judgment is appropriate.

2. *Elements of Laches*

This Court has held that:

> [a] party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it. In this Circuit, there is a strong presumption that a plaintiff's delay in asserting its rights is reasonable as long as an analogous state statute of limitations has not elapsed. In evaluating whether a party has been diligent in protecting its trademark, we look to the state-law statute of limitations for injury to personal property. Here, under Michigan law, that period is three years. In other words, a delay beyond the three-year statutory period is presumptively prejudicial and unreasonable. The period of delay begins to run when plaintiff had actual or constructive knowledge of the alleged infringing activity.

*Nartron*, 305 F.3d at 408 (internal quotation marks and citations omitted). The applicable state statute of limitations in this case is three years. M.C.L.A. § 600.5805(10).

Lanard believes the facts demonstrate that AM General was negligent in the protection of its rights and that AM General's silence misled Lanard into continuing with the production of its toys. Because Lanard was the moving party in the summary judgment motion on the issue of the defenses, we must view the facts in the light most favorable to General Motors and AM General. Additionally, in reviewing the facts, we must keep in mind that the subject matter of the case before us is Lanard's use of the trademarked grille design and the trade dress, not its use of the term "Humvee."

AM General was first aware of Lanard's MUDSLINGER toy in 1993 when AM General contacted Lanard about the use of "Hyper Humvee" on its packaging. After Lanard agreed to discontinue the use of "Hyper Humvee" on its packaging, AM General's representative wrote to Lanard on August 26, 1993: "You state in your telefax that Lanard Toys is redoing its packaging. If that means that Lanard Toys intends to continue selling toy vehicles that replicate AM General's HUMMER vehicle, we believe that Lanard Toys may still be violating our client's rights." Based on this letter, there appears to be a material issue of fact as to whether AM General was aware that Lanard Toys was going to continue making its Humvee-styled toys without the "Humvee" name. A reasonable fact-finder could interpret Lanard's silence to constitute agreement with AM General that the company would cease making its toys or, as actually happened, the letter could have been ignored by Lanard. Considering the language in AM General's letter and the failure of Lanard to respond, a jury could believe that AM General was unaware that Lanard continued making its Humvee-styled toys.

The parties again contacted each other in 1997, and this time Lanard initiated the dialogue to make a deal with AM General to add the name "Humvee" back to the toys, and included pictures of the toys in question. Based on this letter, there is still a material issue of fact as to whether AM General took this letter to mean Lanard was already producing the Humvee-styled toys and wanted to use the "Humvee" name, or whether the entire production of the toys rested on whether AM General would allow Lanard to use the name. Because there remains a question of fact whether AM

General delayed in the exercising of its rights, the district court was correct to deny summary judgment as to the laches and estoppel defenses and submit those questions to a jury.

III.

Based on the discussion above, we affirm the decisions of the district court.

---

## CONCURRENCE

---

RYAN, Circuit Judge, concurring.  While I concur entirely with my colleagues' conclusion that the district court's judgment must be affirmed, I write separately to emphasize that I vote to affirm only because I'm satisfied that there is no "genuine issue of material fact," under Fed. R. Civ. P. 56, that can preclude judgment for the plaintiff, as a matter of law, particularly as the term of art "genuine issue" has been interpreted by the Supreme Court in the *Celotex* trilogy. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

I express no view about the sufficiency of the evidence with respect to any issue in the case.