RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LEAPERS, INC.,

            *Plaintiff-Appellant*,

*v.*

SMTS, LLC, et al.,

            *Defendants*,

SUN OPTICS USA,

            *Defendant-Appellee*.

No. 17-1007

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-12290—Robert H. Cleland, District Judge.

Argued: October 5, 2017

Decided and Filed: January 10, 2018

Before: CLAY, COOK, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Brian D. Wassom, WARNER NORCROSS & JUDD LLP, Southfield, Michigan, for Appellant. Joseph F. Cleveland, Jr., BRACKETT & ELLIS, PC, Fort Worth, Texas, for Appellee. **ON BRIEF:** Brian D. Wassom, WARNER NORCROSS & JUDD LLP, Southfield, Michigan, Matthew T. Nelson, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant. Joseph F. Cleveland, Jr., BRACKETT & ELLIS, PC, Fort Worth, Texas, James K. Thome, VANDEVEER GARZIA, PC, Troy, Michigan, Douglas P. LaLone, FISHMAN STEWART, PLLC, Bloomfield Hills, Michigan, for Appellee.

_____

**OPINION**

_____

CLAY, Circuit Judge.   Plaintiff Leapers, Inc. appeals the district court's entry of summary judgment for Defendant Sun Optics USA in Plaintiff's case alleging trade dress infringement under the Lanham Act, 15 U.S.C. § 1051, *et seq.*  For the reasons set forth below, we **VACATE** the district court's judgment and **REMAND** the case for further proceedings.

**BACKGROUND**

Plaintiff Leapers, Inc. makes adjustable rifle scopes.  Several portions of Plaintiff's products are textured with so-called "knurling," which allows users to grip the products more easily and to make fine-tuned adjustments.  Knurling can be found on a wide variety of everyday items such as door handles, coin edges, and bottle lids.  Plaintiff asserts that it uses a unique knurling pattern that is distinctly "ornamental" and by which consumers recognize Plaintiff as the source of the product.

Plaintiff began manufacturing rifle scopes bearing this particular knurling design in 2002. Plaintiff later entered into an exclusive manufacturing contract with Chuanwen Shi and Donghui Yang of the Nantong WuYang Sporting Goods factory in China.  As part of this contract, the factory managers agreed to "never disclose any information related to [Plaintiff's] products." (R. 109 at PageID #4776.)

On November 17, 2011, Plaintiff ended its relationship with the Nantong WuYang factory, and factory representatives agreed to "cease using any and all technical specifications, product design documents, [and] packaging design documents related to any of [Plaintiff's] products" and to "[d]estroy any and all parts, accessories, attachments, and the like, related to any of [Plaintiff's] products previously produced to fulfill [Plaintiff's] orders." (*Id.*)  However, factory manager Shi apparently never followed through on this agreement.  Instead, he formed a company called Trarms, Inc., through which he began selling rifle scopes himself.  He also began manufacturing rifle scopes for other sellers of rifle scopes, including Defendant and another company, SMTS, LLC.

On June 10, 2014, Plaintiff filed suit against Defendant[1] seeking monetary and injunctive relief for trade dress infringement of Plaintiff's rifle scope knurling design. The case progressed to discovery, and factory manager Shi refused to testify, asserting his Fifth Amendment privilege to nearly every question asked. When Trarms, Inc. refused to provide an alternate witness, Plaintiff moved to compel discovery.

Defendant filed for summary judgment on the basis that Plaintiff would not be able to prove two essential elements of its trade dress claim, namely nonfunctionality and secondary meaning. As further discussed below, the combination of these two elements ensures that a product feature receives trade dress protection only if it does not contribute to the product's utility (*i.e.*, is nonfunctional) and confers distinctiveness akin to a brand (*i.e.*, has a secondary meaning). Defendant argued that the district court should grant summary judgment despite Plaintiff's pending discovery motion because Shi's testimony would be irrelevant to both of these elements. Plaintiff opposed summary judgment, arguing that it had sufficiently supported its trade dress claim and that additional discovery from Shi or Trarms, Inc. would demonstrate that "[t]he elements of [Plaintiff's] trade dress were not chosen for functional reasons and do not add to the functionality of the scopes to which they are applied." (R. 81 ¶ 5(l); R. 84.) Plaintiff also argued that additional discovery was necessary on the issue of secondary meaning.

The district court granted Defendant's motion for summary judgment. The court rejected the notion that summary judgment was premature, concluding that Plaintiff's knurling design could not satisfy the nonfunctionality requirement. The court stated that additional discovery from Shi would provide "but one more conclusory opinion" that could not "change the fact that Plaintiff's trade dress is a functional grip, not just decoration." *Leapers, Inc. v. SMTS, LLC*, 2016 WL 8732507, at *8 (E.D. Mich. Mar. 25, 2016). The court's holding did not reach the question of secondary meaning, but the court opined that Plaintiff had likely introduced enough evidence—although barely—to create a triable question on the issue.

The district court denied Plaintiff's motion for reconsideration and entered final judgment on December 2, 2016. Plaintiff then filed this timely appeal.

---

[1]Plaintiff also filed suit against Trarms, Inc. and SMTS, LLC but has since resolved its claims against these parties. This appeal therefore concerns only a single defendant, Sun Optics USA.

## DISCUSSION

### A.  Standard of Review

We review *de novo* a district court's grant of summary judgment in a trade dress claim case.  *See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP,* 423 F.3d 539, 546 (6th Cir. 2005).  Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  *Id.* (quoting Fed. R. Civ. P. 56(c)).  This Court must draw all reasonable inferences in favor of the non-moving party.  *Id.*

### B.  Analysis

The Lanham Act's protection extends to trade dress.  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000); *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l., Inc.*, 730 F.3d 494, 503 (6th Cir. 2013).  As this Court has previously explained:

> "Trade dress" refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sales.  Trade dress involves the total image of a product and may include features such as size, shape, color, or color combinations, texture, graphics, or even particular sales techniques.

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (internal citations and punctuation marks omitted).

The Lanham Act, 15 U.S.C § 1125(a), creates a civil cause of action for trade dress infringement.  In relevant part, the statute provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

In order to prevail on a claim for trade dress infringement based on a product's design, a plaintiff must show that its design is (1) nonfunctional, (2) has acquired a secondary meaning, and (3) is confusingly similar to the allegedly infringing design. *Groeneveld*, 730 F.3d at 504 (citing *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006)). The Supreme Court has cautioned against misuse or overextension of trade dress, explaining that "product design almost invariably serves purposes other than source identification." *See Samara Brothers*, 529 U.S. at 213. Summary judgment will be granted if the plaintiff "fails to present sufficient evidence for a reasonable jury to find in its favor on any one of the three elements." *See Groeneveld*, 730 F.3d at 504 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Plaintiff alleges that four design elements collectively serve as the "identifying characteristics or decorations connected with [its] product . . . that makes the source of the product distinguishable from another and promotes its sales." *See Abercrombie*, 280 F.3d at 629 (internal alterations omitted). These design elements are (1) "wave-like scalloping" with soft, round edges; (2) straight, parallel, unbroken lines; (3) consistent use of wavelike scalloping at all relevant points on the rifle scopes, including at the ocular and objective ends as well as on the adjustment knobs; and (4) wide banding, with rough proportionality between the raised and lowered portions of the scalloping.

### 1. Nonfunctionality

The nonfunctionality requirement "channel[s] the legal protection of useful designs from the realm of trademark to that of patent." *Groeneveld*, 730 F.3d at 508. "Such channeling ensures that the high public costs of monopoly are not imposed without an assurance that the design satisfies the rigorous requirements of patentability, including novelty and nonobviousness, and is protected for only a limited period of time." *Id.* (citing *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 164–65 (1995)).

In *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982), the Supreme Court explained that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." In order to prove *non*functionality, then, a plaintiff must prove that its design does not meet either prong of the *Inwood* functionality test,

*viz*, the plaintiff must show that its design feature is not "essential to the use or purpose of the article" and that it does not "affect[] the cost or quality of the article." *See Inwood*, 456 U.S. at 850 n.10.

In *Groeneveld*, this Court examined whether certain elements of a grease pump's design were eligible for trade dress protection. Applying the *Inwood* inquiry, we found that each of the design elements either reduced production costs or augmented the usefulness of the grease pump:

> The shape of the base is functionally determined because it minimizes the amount of material needed in construction. And the volume of the reservoir is functionally dictated by the amount of grease that the vehicle needs during each servicing interval. The use of clear material in the reservoir is also functional because it allows one to easily see how much grease is left in the pump.

730 F.3d at 505. Thus, the grease pump's design was functional and could not receive trade dress protection.

Not every case is so clear-cut. The burden of proving nonfunctionality is unusual because it requires a party to introduce affirmative evidence that a quality is *not* present—to introduce "evidence of an absence" rather than merely an absence of evidence. Evidence that a product design is purely "ornamental, incidental, or arbitrary" can be evidence of an absence of functionality. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 30 (2001).

Evidence of aesthetic intent—that the product was designed for an aesthetic purpose—tends to show that a product's design is purely ornamental, incidental, or arbitrary. Intent, however, is not conclusive; not every design created for an aesthetic purpose will turn out to be nonfunctional. Indeed, a design might turn out to have functional value despite any original aesthetic intent if the design becomes "essential to the use or purpose of the article" or if it turns out to "affect[] the cost or quality of the article." *See Inwood*, 456 U.S. at 850 n.10. For example, a new windshield designed solely for the purpose of making a sedan more visually appealing will nevertheless be deemed functional if the windshield turns out to be more aerodynamic or cheaper to produce than other designs. Thus, proof of aesthetic intent alone cannot establish nonfunctionality due to the possibility of incidental functionality.

Aesthetic intent alone is also insufficient because some products function based on their aesthetic properties through so-called "aesthetic functionality." *See Abercrombie*, 280 F.3d at 642. A design has aesthetic functionality when it communicates the use, purpose, cost, or quality of the product in a way that competitors cannot avoid replicating without incurring costs "not to copy but to design around." *See id.* at 642–43 (quoting *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 340 (7th Cir. 1985)). But "there are few aesthetic designs that are so fundamental to an industry that competitors cannot fairly compete without free use of [them]." 1 *McCarthy on Trademarks and Unfair Competition* § 7:81 (5th ed.). Thus, a party's initial burden to show that a design lacks aesthetic functionality is not substantial; the plaintiff need only show that the design is not a competitive necessity such that "exclusive use . . . would put competitors at a significant non-reputation related disadvantage." *See TrafFix*, 532 U.S. at 32–33 (internal citations, quotations, and alterations omitted).

In *Abercrombie*, the plaintiff clothing manufacturer sought trade dress protection for the design of its clothing line, which it defined broadly to include any of the following words or phrases printed on any "solid, plaid and stripe design[]" and in any "primary color combination[]": *performance*, *authentic*, *genuine brand*, *trademark*, and *since 1892*. 280 F.3d at 643. Although there was no indication that the use of such designs affected the clothing's fit, comfort, or durability, the plaintiff conceded that consumers' aesthetic tastes drove the market for its clothing. *See id.* Indeed, the plaintiff said that its design was expressive with regard to the quality of the clothing, "convey[ing] the reliability of the ... brand" both in stores and when worn. *See id.* This evidence, along with the sheer breadth of the plaintiff's purported trade dress, indicated that exclusive use of the design would leave competitors at a significant, non-reputation related disadvantage in the market for "reliable rugged and/or athletic casual clothing drawn from a consistent texture, design, and color palette." *Id.* Lacking any evidence to the contrary, this Court concluded that the design had aesthetic functionality.

By contrast, the plaintiff automobile manufacturer in *General Motors Corp. v. Lanard Toys, Inc.* succeeded in its claim that the defendant, a toy car manufacturer, infringed its trade dress by copying the aesthetic design of its Humvee vehicle. 468 F.3d 405, 416–17 (6th Cir. 2006). A witness for the plaintiff testified that the Humvee's design was motivated purely by

aesthetics and not by function. *Id.* The plaintiff's purported trade dress consisted of a specific grille design, a slanted and raised hood, a two-panel windshield, rectangular doors, and squared edges. *Id.* at 417. These features were expressive; they communicated the use and purpose of the Humvee as a strong, hardwearing vehicle. *See id.* Although this suggested the possibility of aesthetic function, the plaintiff also introduced evidence that the market for the Humvee was not driven by aesthetics, meaning that exclusive use of its design would not significantly impact competition. *See id.* Specifically, the plaintiff showed that the Humvee was designed to meet military specifications, none of which described the aesthetic design elements at issue. *See id.* Additionally, the plaintiff emphasized the narrow definition of its design, which would allow competitors to create a wide range of strong, hardwearing designs without incurring costs "not to copy but to design around" the Humvee's design. Based on this evidence, we concluded that the plaintiff had met its burden to show that its design was purely ornamental and therefore nonfunctional. *See id.*

Similarly, an aesthetic design that merely communicates the *source* of the article—rather than anything about the article's use, purpose, cost, or quality—is not functional. In *Qualitex Company v. Jacobson Products Company,* 514 U.S. 159 (1995), the Supreme Court examined a trade dress claim brought by a manufacturer of dry cleaning pads. The manufacturer dyed its dry cleaning pads an unusual, glossy color that it called "green-gold," and it sought to prevent a competitor from using the same color for its pads. *Qualitex,* 514 U.S. at 161. The Court held that "a color may sometimes meet the basic legal requirements," for trade dress protection, including nonfunctionality. *Id.* at 174. The Court imagined circumstances where a product's color would be dictated by functional requirements, such as when the key ingredient of a drug has a distinctive color. *Id.* at 169. The Court also considered circumstances where a color would have aesthetic function, such as when the black color of a boat motor functioned to "decreas[e] the apparent size of the motor and ensur[e] compatibility with many different boat colors." *Id.* Absent any indication that the green-gold color of the plaintiff's dry cleaning pads had such functionality, however, the Court concluded that the color could constitute trade dress. *Id.* at 173–74.

In this case, Plaintiff admits that knurling is a functional component of a rifle scope. Plaintiff argues, however, that it applies a purely ornamental design to the knurling on its rifle scopes and that *this* design—not knurling generally—constitutes its trade dress. A knurling pattern can be purely ornamental, at least as a hypothetical matter; a unique knurling pattern— perhaps in the shape of a company's name or logo—could have no impact on the knurling's functionality. *Cf. Qualitex*, 514 U.S. at 169–74. As long as the pattern is not "essential to the use or purpose" of a rifle scope and does not "affect[] the cost or quality" of a rifle scope, the knurling design confers no incidental functionality. And as long as the knurling design does not have an aesthetic function such that "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage," the design also lacks aesthetic function and can be protected as trade dress—just like the unique color of a dry cleaning pad, *see Qualitex*, 514 U.S. at 170, or the unique aesthetic of a Humvee, *see Lanard Toys*, 468 F.3d at 416–17.

A jury could reasonably conclude that Plaintiff's knurling design is purely ornamental and therefore nonfunctional. Plaintiff introduced various testimonies to demonstrate that Plaintiff is unaware of any functional benefit of its design and that Plaintiff chose the design for a purely aesthetic purpose: to make the scopes "stand out from the competition." (R. 82 at PageID #3769; R. 86-17 at PageID #4291.) If the jury finds these testimonies credible, it could conclude that Plaintiff did not achieve functionality where none was intended—so long as Plaintiff adequately rebuts the possibilities of incidental functionality and aesthetic functionality.

Plaintiff also provided evidence negating incidental functionality. Plaintiff showed that its competitors apply knurling to their rifle scopes' adjustment knobs in a wide variety of patterns, many of which are more effective than Plaintiff's design at making the knobs' adjustment surfaces graspable. In other words, Plaintiff adorns its products with a knurling pattern that is not particularly effective at achieving knurling's primary purpose. A jury could therefore conclude that Plaintiff's design does not represent a technological advancement, even by accident, and that its claim need not be "channel[ed] . . . from the realm of trademark to that of patent." *See Groeneveld*, 730 F.3d at 508.

Finally, Plaintiff introduced evidence that its design lacks aesthetic functionality. The record indicates that competition in the rifle scope industry is not based on the visual appeal

of knurling or of adjustment knobs more generally; instead, rifle scope manufacturers design their knobs "in ways that allow them to be better gripped to perform the function of adjustment." (R. 109 at PageID #4786.) Even so, Defendant argues that the range of available knurling designs is limited by functional requirements, especially the requirement of making the surface of an adjustment knob more graspable without compromising the structural integrity of the knob. If the range of available designs is truly constrained, any claim of trade dress protection must fail due to competitive necessity. But Plaintiff introduced its own expert report, which states that the elements of its design are *not* dictated by functional requirements. Although this conclusory assertion on its own would not be enough to withstand summary judgment, the report also incorporates pictures of numerous knurling designs that are currently used in the market. These images cast doubt on Defendant's assertion of a design constraint and would allow a jury to find that the variety of knurling patterns that can be applied to an adjustment knob is effectively unlimited, much like the variety of colors that that can be applied to a dry cleaning pad. *See Qualitex*, 514 U.S. at 169–74. Finding no "scarcity" or "depletion" of available designs, the jury could then conclude that exclusive use of Plaintiff's design would not put competitors at a significant, non-reputation related disadvantage. *See id.* (rejecting "color depletion" argument).

Plaintiff asserts that Chuanwen Shi, or an alternate witness from Trarms, Inc., would buttress this evidence of nonfunctionality by testifying that Plaintiff's design elements "do not add to the functionality of the scopes to which they are applied." Contrary to the district court's conclusion that this testimony would be merely a "conclusory opinion," we consider testimony from a direct competitor to be strongly probative of whether "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *See TrafFix*, 532 U.S. at 32. A competitor who copies a design has a strong incentive to identify the functional benefits of the copied design. Thus, credible evidence of a competitor's fruitless search *for* function is evidence of *non*function. In the unusual circumstances here, where a competitor's corporate representative invokes his Fifth Amendment privilege in order to avoid answering questions about a product's functionality—and where the company refuses to designate a different witness to testify—a jury could reasonably infer that the competitor tried and failed to identify any functionality. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (holding that a party's refusal to testify in response to probative evidence offered against it in a civil action permits an adverse

inference); *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 455 (6th Cir. 2004) (applying *Baxter* to draw inference in favor of non-movant).

Furthermore, Plaintiff has shown that Shi, the corporate designee, attempted to register a design patent in China covering Plaintiff's alleged trade dress. Plaintiff argues that Shi's pursuit of a design patent, as opposed to an invention or utility model patent, provides further evidence that Shi considers Plaintiff's design to lack any functional value. *See* Patent Law (promulgated by the State Intellectual Property Office of the P.R.C., effective Dec. 27, 2008), art. 2 (defining types of patents under Chinese law). A jury could indeed draw an inference that Shi is unaware of any functional benefit that would qualify Plaintiff's design for protection under an invention or utility model patent.

From this evidence, a jury could properly conclude that Plaintiff's design is purely ornamental and therefore nonfunctional. The district court therefore erred when it granted summary judgment to Defendant on the basis of nonfunctionality. Indeed, the district court incorrectly concluded that knurling designs are *per se* functional, stating the following:

> [T]he "design" all witnesses refer to is the design of a *grip*. A grip is inalterably functional. It exists to grasp or grip a thing more securely. Because the scope could not function without the grip—in that it could not be adjusted as to focus— it is "essential to the use or the purpose" of the scope in question.

*Leapers, Inc. v. SMTS, LLC*, 2016 WL 8732507, at *5 (E.D. Mich. Mar. 25, 2016). The district court was correct that knurling is "inalterably functional" in that it allows a rifle scope user to "grasp or grip a thing more securely." However, Plaintiff does not assert that its trade dress consists of knurling; rather, Plaintiff alleges that its trade dress consists of a unique *design* that is printed into knurling. Thus, the nonfunctionality inquiry in this case must focus on the design of Plaintiff's knurling and not on knurling in general. The district court erred by failing to make this distinction during summary judgment.

The district court acknowledged this distinction in a subsequent order. The court recognized that "*some* aspect of a grip design could conceivably be nonfunctional," and gave the example of "a particular color pattern." *Leapers, Inc. v. SMTS, LLC*, 2017 WL 3084370, at *4 (E.D. Mich. July 20, 2017). The court then found, incorrectly, that Plaintiff's knurling pattern

does not qualify for such a distinction because it "is inseparable from how the grip on the various adjustment knobs perform its function—which is to provide a surface to grip the knob." *Id.* We disagree that there is a meaningful distinction between a pattern and a color; both types of ornamentation can be nonfunctional.

The district court's concern appears to stem from the possibility that Plaintiff's design is not distinctive enough to be "divorced from the functional nature of the grip." *See id.* Whether an untrained observer is likely to recognize Plaintiff's knurling as branded rather than quotidian is irrelevant to the nonfunctionality inquiry. Instead, the distinctiveness of the design relates to whether it is capable of establishing a secondary meaning.

## 2. Secondary Meaning

Secondary meaning "serves to identify the product with its manufacturer or source." *TrafFix*, 532 U.S. at 28. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood*, 456 U.S. at 851 n.11. "This Court applies a seven-factor test to determine whether secondary meaning exists in a trade dress: (1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying." *Lanard Toys*, 468 F.3d at 418. "No single factor is determinative and every one need not be proven." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 312 (6th Cir. 2001) (citing *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)). Even so, "[t]he evidentiary burden necessary to establish secondary meaning is substantial." *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 513 (6th Cir. 2004) (quoting *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989). Secondary meaning can only be established if a party shows by a preponderance of the evidence that consumers view the trade dress as denoting "a single thing coming from a single source." *See id.* (quoting *Burke–Parsons-Bowlby*, 871 F.2d at 596).

Defendant invites this Court to affirm on the basis that no reasonable jury could conclude that Plaintiff's knurling design has acquired a secondary meaning. We decline to do so. The district court did not resolve the issue of secondary meaning below. Although it was "inclined to find that the Plaintiff has furnished enough evidence—barely—to survive summary judgment on this point," the district court examined only two of the seven factors relating to secondary meaning, concluded that several of the other factors were "irrelevant," and ultimately declined to rule on the matter as a whole. *Leapers*, 2017 WL 3084370, at \*3–4. The district court declined to fully develop a secondary meaning analysis and instead opted to treat distinctiveness as a factor relating to nonfunctionality.

Nevertheless, we decline to conduct a more thorough secondary meaning inquiry on this record because of the possibility that more discovery may be conducted on remand due to Plaintiff's pending discovery request. Whether additional discovery is appropriate is a question left to the sound discretion of the district court. We therefore remand the case so that the district court can consider Plaintiff's request for additional discovery, to be followed by a definitive ruling on whether Plaintiff has created a genuine issue regarding whether its design has established a secondary meaning.

**CONCLUSION**

In conclusion, a jury could reasonably find that Plaintiff's design is nonfunctional because Plaintiff's design is purely ornamental. We therefore hold that the district court erred by granting summary judgment for Defendant based on the nonfunctionality element of Plaintiff's trade dress claim. Additionally, the district court declined to resolve the issue of secondary meaning. Because proper resolution of this issue requires further consideration of Plaintiff's request for additional discovery, we decline to reach it.

For the foregoing reasons, we **VACATE** the district court's judgment and **REMAND** the case for further proceedings consistent with this opinion.