**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0434n.06
Filed: June 21, 2007

**No. 06-3452**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **RACHAEL COX** | ) | |
| | ) | |
| *Plaintiff- Appellant,* | ) | ON APPEAL FROM THE |
| | ) | U N I T E D   S T A T E S |
| v. | ) | DISTRICT COURT FOR |
| | ) | T H E   S O U T H E R N |
| **JAMES DRAKE, OFFICER,** *ET AL.,* | ) | DISTRICT OF OHIO |
| | ) | |
| *Defendants-Appellees.* | ) | **O P I N I O N** |

Before: GILMAN and SUTTON, Circuit Judges, and TARNOW, District Judge*

**ARTHUR J. TARNOW,** District Judge. Plaintiff Rachael Cox brought suit in the district court claiming that Defendants violated her Fourteenth Amendment Due Process rights in connection with their involvement in an alleged eviction from her rented residence. The district court determined that Plaintiff was not deprived of her possessory interest in her rented property under Fourteenth Amendment due process analysis. As a result, the district court granted Defendants' motion for summary judgment and dismissed the case. We AFFIRM the district court's determination that summary judgment is appropriate because Plaintiff was not deprived of her possessory interest in her rented home by state action.

**Factual History**

Since December 1, 2001, Plaintiff Rachael Cox rented a residence located at 4267 Redmont Avenue in the City of Deer Park from landlord Betty Nabors. Plaintiff's former husband Johnny Cox occasionally stayed at the residence with her and her son. Rachael Cox admits that both she and Johnny Cox used crack cocaine at the house at least a dozen times prior to the alleged eviction. Rachael Cox would give money to Johnny Cox so that he could buy drugs for both her and her acquaintances, who also used the drugs at her home. However, she denies that she ever sold drugs or that she ever personally bought crack.

On November 10, 2003, after using crack and becoming ill, Rachael Cox telephoned her mother asking for help. After arriving at the Redmont residence, her mother called 911. Soon thereafter, City of Deer Park police officers arrived at the residence along with an ambulance and medical personnel. Officer James Drake was one of the officers who arrived at the scene. The paramedics proceeded to transport Rachael Cox to University Hospital for treatment for a cocaine overdose. No arrests were made.

The November 10 incident was the impetus for Rachael Cox to stop using drugs. She began attending Alcoholics Anonymous meetings, and found herself a sponsor within the group. Despite her change in lifestyle, Rachael Cox claims that the Deer Park Police Department, in particular Officer Drake, began to harass her and her acquaintances.

Officer Drake admits that there was a departmental decision to "watch the house, to make sure that… [the Police Department was] aware of what was going on in the residence."  The City of Deer Park Police Chief approved of the decision to watch Rachael Cox's house.  According to Officer Drake, this was not the first instance where this method of surveillance had been used on a particular residence by the City of Deer Park Police Department.

During the first week of December 2003, Officer Drake pulled over Johnny Cox, who was driving Rachael Cox's car, because the license plate light was not functional.  Officer Drake asked to search the car, but Johnny Cox refused.  Officer Drake in turn radioed for search dogs from a neighboring city.  The search dogs arrived, but nothing illegal was discovered.

On April 1, 2004, Officer Drake pulled over Rachael and Johnny Cox in order to arrest Johnny Cox for his failure to pay the traffic ticket he had received from the December 2003 traffic stop.  Officer Drake approached the car with his gun drawn and told Johnny Cox to step out of the car.  Once out of the car, Officer Drake patted him down, found a small pocket knife on his person and proceeded to handcuff him.

After complying with the officers' instruction to exit the car, Rachael Cox agreed to an officer's request to search her car.  During the search, Rachael Cox claims that Officer Drake remarked that she was in a lot of trouble and that the police had an appointment to speak with her landlord at 3:00 p.m. to inform her about all the trouble Rachael Cox was causing.

Later that day, Rachael Cox called Officer Drake and requested a meeting to

discuss the situation. They agreed to meet at the police station. During the meeting, Officer Drake informed Rachael Cox that a total of 16 separate 911 calls had been placed by her neighbors concerning incidents at the residence. According to Rachael Cox, Officer Drake also told her that "he didn't want people like [her] in their neighborhood, that [she] needed to leave, and that [she] needed to find a new residence." Officer Drake also mentioned that he was going to speak to her landlord and tell the landlord that her house might be subject to abatement procedures if Rachael Cox was not evicted. Officer Drake denies making these remarks.

In response, Rachael Cox told Officer Drake that she was clean and sober. To demonstrate her sincerity, she offered to take a urine test. Officer Drake refused the offer and instead insisted that she "needed to find a new place to live," and that she "had to leave Deer Park" because she was going to be evicted. Again, Officer Drake denies that he made these remarks.

On March 30, 2004, Officer Drake contacted Rachael Cox's landlord, Betty Nabors, by telephone. He told her that he needed to talk to her in person about problems concerning the 4267 Redmont Avenue residence. A meeting was scheduled for April 1, 2004 in the late afternoon.

During either the phone call or the April meeting, Officer Drake told Nabors about the volume of phone calls the police had received related to 4267 Redmont residence. This was the first time that Nabors had heard about such complaints. Besides being late with rent and water bill payments, Nabors had few problems with Rachael Cox. During the face-to-face meeting, Officer Drake informed Nabors that

she could not continue to rent to somebody who is known to be involved in drug activity under Ohio's abatement procedure law.[1] Officer Drake asked Nabors whether she "could do something about this," which Nabors understood to be a suggestion that she evict Rachael Cox. Officer Drake disputes that he requested or even suggested that Nabors evict Rachael Cox. He claims that after reading the crime blotter concerning the residence, Nabors stated that she was going to have to take care of the problem.

After the meeting, Nabors went to the 4267 Redmont residence. She knocked on the door and Rachael Cox answered. Nabors then handed Rachael Cox a three-day "Notice to Leave the Premises" that had been faxed to Nabors earlier by her attorney that she subsequently completed. According to Nabors, Rachael Cox responded to the notice by saying, "I'm leaving, I don't want to cause you any trouble" and "I'm sorry… you're brought into this." Nabors responded by telling Cox: "I don't want you to leave, I don't know, I said the police said I had to. But I said—you know, after the meeting and stuff, I have to Rachael."

Rachael Cox claims that a few days later Nabors called to tell her that she felt that what the police were doing to Rachael was wrong. Nabors also expressed her desire to not have Rachael Cox leave the 4267 Redmont residence.

Officer Drake allegedly followed up Nabor's three-day notice with a phone call

---

[1]Ohio's mandatory eviction statute requires landlords to evict tenants if they know or have a reasonable suspicion that drug use or distribution is taking place in the residence or possibly face misdemeanor charges and/or abatement pursuant to Ohio Rev. Code Ann. § 3767.

to Rachael Cox. He told Rachael Cox that she needed to leave the 4267 Redmont residence "as soon as possible" and asked for a specific date. Officer Drake denies that either the phone call or the conversation took place.

Although the notice gave her until April 5 to vacate the premises, Rachael Cox asked Nabors that she be given until April 15. Soon thereafter, Rachael Cox moved out. As a result, Nabors did not follow through with a forcible entry and detainer (statutory eviction) proceeding.

**Procedural History**

Plaintiff filed a complaint in federal district court pursuant to 42 U.S.C. § 1983 against Officer Drake, alleging the he deprived her of her constitutional rights under both the Ninth Amendment and the Due Process Clause of the Fourteenth Amendment. Rachael Cox also claimed that Officer Drake defamed her. Apx. 5. Both the Ninth Amendment and defamation claims were later abandoned. In terms of her Fourteenth Amendment claim, Plaintiff argues that Officer Drake, acting under the color of law, used his position to cause Betty Nabors to declare a violation of the lease in order to effect her eviction. After discovery, the district court granted Plaintiff's motion for leave to amend the complaint to include Police Chief Guille and the City of Deer Park as defendants.

Defendants filed a joint motion for summary judgment. The district court later granted the motion as to all Defendants. The court determined that even though Plaintiff had a constitutionally protected possessory interest in the 4267 Redmont residence and even though Officer Drake's actions "were arguably reprehensible,"

"Cox was never deprived of physical access to her house by the police, or anyone else, for that matter…" Because the actions did not amount to an eviction under Ohio law, the district court concluded that Plaintiff's alleged facts did not amount to a "deprivation of Cox's possessory property interest." The district court did not reach the questions of whether there was state action, whether Officer Drake was acting pursuant to an official policy or custom, or whether Defendants would have been entitled to qualified immunity.

Plaintiff filed a timely notice of appeal, arguing that the district court erred in its decision to grant summary judgment based on the lack of a constitutional deprivation.

**Standard of Review**

We review a district court's decision to grant summary judgment *de novo*. *GMC v. Larned Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006)(citation omitted). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Id.* at 412 (quotation and citations omitted). Thus for this appeal, all fact disputes will be resolved in favor of the Plaintiff.

**Due Process Analysis**

Plaintiff contends that Defendants violated her Fourteenth Amendment Due Process rights by depriving her of the use and enjoyment of the 4267 Redmont residence without a predeprivation hearing. To adequately plead a 42 U.S.C. § 1983 claim, Plaintiff must allege that a defendant, acting under state law, deprived her of a right secured by the Constitution or laws of the United States- in this instance, the Fourteenth Amendment right to due process. *Thomas v. Cohen*, 304 F.3d 563, 568 (6th Cir. 2002). The Due Process Clause of the Fourteenth Amendment guarantees that "no State shall deprive ... any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. "It is well established that possessory interests in property invoke procedural due process protections." *Thomas*, 304 F.3d at 576 (citing *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972)). "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125 (U.S. 1990). The "root requirement" of the Due Process Clause is that in most cases "an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) (hereinafter "*Loudermill*") (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).

> Procedural due process claims are examined under a two-part analysis. First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment. Only after identifying such a right do we continue to consider whether the deprivation of that interest contravened notions of due process.

*Thomas*, 304 F.3d at 576.

In terms of the first part of the procedural due process analysis, it is settled that under Ohio law, Plaintiff, as a leasehold tenant, had a recognized property interest in the 4267 Redmont residence for Fourteenth Amendment purposes. See Ohio Rev. Code Ann. § 5321.01; *Thomas*, 304 F.3d at 576.

After identifying the protected right, we next turn to whether the deprivation contravened the notions of due process. "It is well settled that a temporary, nonfinal deprivation of property is 'nonetheless' a deprivation in terms of the Fourteenth Amendment, and must be preceded by a fair hearing." *Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972). "In *Feuntes v. Shevin*, the Supreme Court held that due process requires notice and a hearing prior to eviction." *Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994). When a state actor is actively involved in an unlawful eviction, a deprivation occurs which triggers procedural due process rights even if post-deprivation proceedings are available that may be used as a remedy. See *Soldal v. Cook County*, 506 U.S. 56 (1992) (illegal removal of trailer home by private mobile home park owner with county deputy sheriffs present to prevent interference was not only held to be a "seizure" of property for the purposes of the Fourth Amendment, but also actionable separately under the Fourteenth Amendment for lack of procedural due process); *Thomas*, 304 F.3d 563 (a majority upheld district court's determination that qualified immunity and summary judgment was not appropriate for officers who helped transitional shelter unlawfully evict residents without prior notice and hearing in violation of the Fourteenth Amendment); *Flatford*, 17 F.3d 162 (affirming the

district court's denial of qualified immunity to building inspector when he along with police officers evicted tenants from apartment building because of unsafe conditions without prior notice or hearing because he did not act reasonably when he deprived plaintiffs of right to their leasehold property interest, but reversing the district court's denial of qualified immunity to police officers, holding that they acted reasonably under the exigent circumstances of unsafe conditions).

It is undisputed that Plaintiff was not afforded a hearing. However, the *Thomas* analysis does not end there because we must determine whether a deprivation occurred. The district court tried to answer this question by examining whether Plaintiff was "evicted" as defined by Ohio statute and Ohio case law.[2] The district court determined that the undisputed facts failed to amount to either an actual or constructive eviction under Ohio law because Rachael Cox voluntarily left the premises after receiving the "Notice to Vacate the premises" from her landlord. As a result, the district court granted Defendants' motion for summary judgment determining that Plaintiff failed to present evidence of a deprivation.

We agree with the district court, many of the critical facts are undisputed. The

---

[2]An eviction is either actual or constructive under Ohio law. *McAlpin v. Woodruff*, 11 Ohio St. 120 (1860). To constitute an actual eviction under Ohio law, there must be some act of the landlord that compels the abandonment of the property. The mere notice to vacate or demand for possession is not an eviction, since it is a precatory step to instituting an action for forcible and entry and detainer pursuant to Ohio Rev. Code Ann. § 1923.04. *Greenberg v. Murphy*, 16 Ohio C.D. 359 (Ohio Cir. Ct. 1904). However, a notice to vacate by the property owner that the tenancy is being terminated, combined with a demand for possession, is not an actual eviction for which damages may be covered. *Greenberg*, 16 Ohio C.D. at 3. Constructive eviction is the surrender of possession because some act of interference compels the tenant to leave. *Liberal Sav. & Loan Co. v. Frankel Reality Co.*, 137 Ohio St. 489, 499 (1940).

landlord gave Rachael Cox notice that is both required by law and prerequisite to a forcible entry and detainer (statutory eviction) action. However, Rachael Cox vacated the premises before such an action was required and prior to a hearing. Moreover, Defendants did not physically seize the property nor were they present when Plaintiff vacated her premises. In spite of these facts, Plaintiff contends that Officer Drake's alleged intimidating actions and not-so-subtle threats to both her and her landlord amounted to a constructive eviction similar to the one effectuated in *Thomas*. 304 F.3d 563. Rachael Cox relies on the part of Judge Clay's dissent in *Thomas*, where he noted "the lack of physical force is not terribly germane inasmuch as the police effectuated the eviction by the very apparent and not too subtle threat… of dire legal consequences should the tenants not comply with the officers' instructions to vacate the property." 304 F.3d at 572. Even if this portion had been adopted by the majority, which it was not, the facts of *Thomas* are still inapposite since in *Thomas* the state actors were physically present when they unquestionably ordered and escorted tenants from their rooms. In contrast, it was Nabors, the private landlord, who asked Rachael Cox to leave the premises by way of the "Notice to Vacate the Premises" form without any state actors present.

In response, Plaintiff claims that Nabors was coerced to initiate the eviction process through Officer Drake's actions, his statements, and the Deer Park Police Department policy. A state actor under some circumstances can be held responsible for a private decision

> when [the State actor] has exercised coercive power or has provided
> such a significant encouragement, either overt or covert, that the choice

must in law to be that of the State... Mere approval or acquiescence in the initiatives of a private party is not sufficient for those initiatives under the terms of the Fourteenth Amendment...

*Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)(citations omitted).

We nonetheless do not find this argument persuasive. Had Defendants been forcibly removed or barred Plaintiff from entering the premises without following Ohio's forcible detainer procedures, Plaintiff would have an actionable claim because she was deprived of her leasehold interest. Additionally, had Defendants entered the premises and actively participated in a constructive eviction, such as ordering and escorting Plaintiff out of the premises, without following the statutory eviction procedures, this too would amount to an actionable claim. But that is not what transpired. Plaintiff was given notice to vacate through her landlord, which she later complied with by voluntarily vacating the premises outside the presence of state actors. Although Officer Drake may have encouraged Rachael Cox to vacate the premises, it was ultimately her decision to comply with the notice. In contrast, the officers in *Thomas* entered into the tenants' rooms, announced that the tenants had to leave, refused to listen to the tenants' position, and then escorted them out of the shelter all the while without the necessary eviction papers. Here, Rachael Cox had a choice to vacate the premises or challenge an eventual eviction, unlike the tenants in *Thomas* who themselves attempted to challenge the eviction while the officers were present but were not allowed to do so. Although there may be cases where an officer's mere psychological coercion of a tenant to vacate or a landlord to evict a tenant from the premises may constitute a deprivation of property, such as a case that

includes threats of violence, this is not such a case. As a result, we determine that Plaintiff was not deprived of the use of her rented premises due to state action. Accordingly, the district court's order dismissing the case is AFFIRMED.[3]

---

[3]This opinion does not address the lawfulness and constitutionality of either the mandatory eviction statute or the City of Deer Park's surveillance policy.