GILMAN, J., delivered the opinion of the court, in which GRIFFIN, J., joined. WHITE, J. (pp. 521-37), delivered a separate dissenting opinion.
OPINION
RONALD LEE GILMAN, Circuit Judge.
The key issue in this case is whether a company can use trade-dress law to protect its functional product design from competition with a “copycat” design made by another company where there is no reasonable likelihood that consumers would confuse the two companies’ products as emanating from a single source. We hold that it cannot. In so holding, we reaffirm that trademark law is designed to promote brand recognition, not to insulate product manufacturers from lawful competition.
Groeneveld Transport Efficiency, Inc. sued Lubecore International, Inc., claiming that Lubecore’s automotive grease pump is a “virtually identical” copy of Groeneveld’s automotive grease pump. The complaint asserts that such copying constitutes trade-dress infringement in violation of § 43(a) of the Lanham (Trademark) Act, 15 U.S.C. § 1125(a), and further violates a number of related federal and Ohio laws. All the claims except trade-dress infringement were dismissed when the district court granted Lubecore’s motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The trade-dress claim went to the jury, which found for Groeneveld and awarded it $1,225,000 in damages.
Lubecore appeals the denial of its Rule 50 motion with respect to the trade-dress claim. Groeneveld in turn cross-appeals from the dismissal of its other claims. For the reasons set forth below, we REVERSE the judgment of the district court denying Lubecore’s Rule 50 motion with respect to Groeneveld’s trade-dress claim, AFFIRM the district court’s dismissal of Groeneveld’s other claims, and REMAND the case with instructions to enter judgment as a matter of law in favor of Lube-core on all claims.
I. BACKGROUND
A. Factual background
This case, like many trademark cases before it, is a contest between an oldtimer and a newcomer. Their battle is over a relatively obscure product — the grease pump used in an automated lubrication system (ALS) for commercial trucks. An ALS, as the name implies, is a system for delivering a controlled amount of lubricant to different parts of a machine (in this case a commercial truck) while the machine is in operation. Automated lubrication saves time, increases operational efficiency, and minimizes corrosion by obviating the need for frequent manual lubrication. The primary component of an ALS is a grease pump that forces grease through injectors and hoses to targeted areas at timed intervals.
Groeneveld is the American branch of a Dutch company that has been in the ALS business for over 40 years. It began marketing the grease pump at issue in the present case — designated by Groeneveld as its EP0 pump — in the 1980s. The Groeneveld family of companies employs thousands of people and has a well-established international presence.
Lubecore, by contrast, is the new kid on the block. It was founded in 2007 by Jan Eisses, who had previously sold another company of his to Groeneveld and had *501 been a Groeneveld employee for approximately three years. Lubecore is located in Canada, is owned by Eisses and his wife, and employed 12 people at the time of pretrial discovery. It designed the grease pump at issue in this case in December 2007 and began selling it first in Canada (starting in April 2008) and then in the United States (starting in March 2009). The two companies’ competing grease pumps are shown below:
[[Image here]]
B. Procedural background
In April 2010, Groeneveld brought suit against Lubecore in the United States District Court for the Northern District of Ohio. The complaint alleged that Lubecore was marketing a grease pump that was “virtually identical” to Groeneveld’s pump with the intent to confuse consumers into believing that the two pumps were made by the same company, thus freeriding on Groeneveld’s established goodwill by passing off Lubecore pumps as Groeneveld pumps. Groeneveld further alleged that, of all competing manufacturers, only Lube-core made a pump that had essentially the same design as Groeneveld’s.
The complaint asserted six claims against Lubecore: trade-dress infringement, unfair competition, and false advertising, all in violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a) (Counts 1-3); deceptive trade practices, in violation of Ohio Revised Code §§ 4165.02 et seq. (Count 4); unfair competition, in violation of Ohio common law (Count 5); and unlawful interference with contractual and business relationships, again in violation of Ohio common law (Count 6). Groeneveld sought monetary damages and permanent injunctive relief. It also filed a motion for a preliminary injunction on the same day as the complaint.
The parties consented to the adjudication of Groeneveld’s preliminary-injunction motion by a magistrate judge, who denied the motion after a four-day hearing. Groeneveld and Lubecore then filed cross- *502 motions for summary judgment before the district court. In a three-page summary order, the court denied both motions and set the case for trial.
A seven-day jury trial was held in October 2011. At the close of Groeneveld’s proof, Lubecore moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, which motion it renewed at the close of all the evidence. The district court, ruling from the bench and without any analysis (other than “I’ve listened to everything, believe me”), granted Lubecore’s Rule 50 motion with respect to Counts 2-6 of the complaint, but reserved ruling on Count 1, the trade-dress claim.
Count 1 was subsequently submitted to the jury in the form of the following three interrogatories, which track the three elements of a trade-dress claim:
1. Do you find that Plaintiff Groene-veld proved by a preponderance of the evidence that its Trade Dress (the external shape and appearance of the pump, including logo and color) are non-functional?
2. Do you find that Plaintiff Groene-veld proved by a preponderance of the evidence that its Trade Dress (the external shape and appearance of the pump, including logo and color) is distinctive in the marketplace, that is has it acquired secondary meaning?
3. Do you find that Plaintiff Groene-veld proved by a preponderance of the evidence that there is a likelihood of confusion in the minds of consumers of EP[0] pumps as to the source of Defendant Lubecore’s EP[0] pump?
The jury answered “yes” to all three interrogatories and awarded Groeneveld damages in the amount of $1,225,000. On the following day, the jury returned to hear arguments as to whether Lubecore’s trade-dress infringement had been willful (which would be a relevant consideration for the purpose of damages in the event that Groeneveld’s other claims were revived on appeal). It answered “yes” to this question also. The district court accepted the jury’s answers and entered judgment in favor of Groeneveld. It also entered a permanent injunction barring Lubecore from selling its grease pump in the United States.
After the jury rendered its verdict, Lubecore renewed its pending Rule 50 motion for judgment as a matter of law and moved in the alternative for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. The district court denied both motions. Lubecore’s timely appeal and Groeneveld’s cross-appeal followed.
Regarding the denial of its Rule 50 and Rule 59 motions, Lubecore contends that there was insufficient evidence on all three elements of Groeneveld’s trade-dress claim — nonfunctionality, secondary meaning, and the likelihood of confusion — to submit the claim to the jury. Alternatively, Lubecore argues that the jury’s findings on all three elements were against the weight of the evidence. It also seeks to set aside the damage award on the ground that there was no finding of a causal link between Lubecore’s alleged trade-dress infringement and Groeneveld’s lost profits. Groeneveld’s cross-appeal, in turn, seeks a judgment and punitive damages on the previously dismissed counts of its complaint (Counts 2-6), as well as a broadening of the district court’s injunction to include Canada.
II. ANALYSIS OF LUBECORE’S APPEAL
A. Standard of review
Rule 50 of the Federal Rules of Civil Procedure authorizes a court to grant judgment as a matter of law when “a party *503 has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.” Fed.R.Civ.P. 50(a). A motion for judgment as a matter of law should be granted “if, under the governing law, there can be but one reasonable conclusion as to the verdict.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The standard for judgment as a matter of law under Rule 50 is the same as the standard for summary judgment under Rule 56. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). We review the district court’s denial of a Rule 50 motion de novo. Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 543 (6th Cir.2008).
B. Legal framework
The Lanham Act, 15 U.S.C. §§ 1051-1141n, encompasses the protection not just of wordmarks and symbols, but also of trade dress. Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). “Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale.” Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 629 (6th Cir.2002) (brackets, ellipsis, and internal quotation marks omitted). It “involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.” Id. (internal quotation marks omitted). Trade dress might include, for example, the outer shape and design of a Ferrari car (Ferrari S.P.A. v. Roberts, 944 F.2d 1235 (6th Cir.1991)), or of a Gibson guitar (Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP, 423 F.3d 539 (6th Cir. 2005)); the arrangement, content, and layout of an Abercrombie & Fitch catalogue (Abercrombie, 280 F.3d 619); or the decoration, vibe, and “motif’ of a Mexican restaurant (Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)).
Trade dress is generally classified into the categories of either “product design” (also known as “product configuration”) or “product packaging,” and occasionally a “tertium quid,” a third, indeterminate catchall. Samara Bros., 529 U.S. at 215, 120 S.Ct. 1339. The trade dress at issue in the present case — the overall design of Groeneveld’s grease pump — indisputably falls under the product-design category.
To prevail on a claim for the infringement of a product-design trade dress, a plaintiff must prove that its allegedly infringed product design (1) is nonfunctional, (2) has acquired secondary meaning, and (3) is confusingly similar to the allegedly infringing product design. Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 414 (6th Cir.2006); accord Samara Bros., 529 U.S. at 211, 120 S.Ct. 1339. The meaning of these three elements is fleshed out in the caselaw.
A product design is functional “if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.” Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). The Supreme Court, for example, has held that the “dual-spring design” employed at the base of road signs to make them withstand strong wind gusts is functional and therefore cannot be protected as trade dress. TrafFix Devices, Inc. v. Mktg. Displays, *504 Inc., 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001).
Secondary meaning, perhaps more helpfully dubbed “acquired meaning,” indicates that “in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.” Inwood Labs., 456 U.S. at 851 n. 11, 102 S.Ct. 2182; Samara Bros., 529 U.S. at 211, 211 n. *, 120 S.Ct. 1339. For example, this court has held that the outer-body design of a Ferrari car possesses secondary meaning because Ferrari showed that the public primarily associates that design with a Ferrari car, not just generically with a sports car. See Ferrari, 944 F.2d at 1239-42.
Finally, the test for confusing similarity, also called the “likelihood of confusion” test, is whether an ordinary consumer would confuse the products at issue, which in fact come from different sources, as emanating from a single source or from associated sources. See, e.g., Daddy’s Junky Music Stores, Inc. v. Big Daddy’s Family Music Ctr., 109 F.3d 275, 280 (6th Cir.1997). The “general concept underlying the likelihood of confusion is that the public believe that the mark or dress owner sponsored or otherwise approved the use of the trademark or trade dress.” Abercrombie, 280 F.3d at 645 (brackets and internal quotation marks omitted). Whereas nonfunctionality and secondary meaning are required to show protectability — that is, that the plaintiffs trade dress is capable of Lanham Act protection in the first place — likelihood of confusion is required to show that the trade dress has in fact been infringed by the defendant. Abercrombie, 280 F.3d at 629.
All three of the foregoing requirements — nonfunctionality, secondary meaning, and the likelihood of confusion— are elements of a trade-dress infringement claim, not defenses to such a claim. See, e.g., Lanard Toys, 468 F.3d at 414. The burden of proving each requirement therefore falls on the plaintiff. Id. at 414, 416-17; 15U.S.C. § 1125(a)(3). If the plaintiff fails to present sufficient evidence for a reasonable jury to find in its favor on any one of the three elements, then judgment as a matter of law should be entered for the defendant. See Celotex Corp. v. Ca-trett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that judgment should be entered against “a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial”).
The parties in the present case dispute whether Groeneveld made a sufficient showing to enable a reasonable jury to find in its favor on each of the three elements. Their focus, however, is on nonfunctionality and the likelihood of confusion. We will therefore concentrate on these two elements.
C. Nonfunctionality
Groeneveld does not dispute that its grease pump is a functional device designed to automatically lubricate commercial trucks. Nor does Groeneveld attempt to protect the individual component parts of its pump. Rather, the question is whether the “overall shape” of the grease pump (such shape being the trade dress claimed by Groeneveld) “is essential to the use or purpose of the article or ... affects the cost or quality of the article.” See Inwood Labs., 456 U.S. at 850 n. 10, 102 S.Ct. 2182.
Groeneveld’s pump, in its overall shape, consists of a black base topped by a clear reservoir. The base is made of cast aluminum and contains the pump mechanism, which is connected by wires and hoses to the rest of the ALS; the reservoir *505 is made of plastic and holds the grease. Both components clearly serve a function essential to the product’s operation.
Trial testimony by two Groeneveld witnesses, Willem van der Hulst and Cornelius Wapenaar, makes clear that not only the basic manufacture of the grease pump’s components, but also their size and shape, are closely linked to the grease-pumping function. The shape of the base is functionally determined because it minimizes the amount of material needed in construction. And the volume of the reservoir is functionally dictated by the amount of grease that the vehicle needs during each servicing interval. The use of clear material in the reservoir is also functional because it allows one to easily see how much grease is left in the pump.
Because the volume of the reservoir (like that of any cylinder) is the algebraic product of its surface area times its height, and because the surface area and the volume of the reservoir are both functionally determined (the former by the necessity of fitting into the base and the latter by the necessity of holding a predetermined amount of grease), the height is also functionally determined. The overall design of the grease pump is therefore functional. As the magistrate judge found when denying Groeneveld’s motion for a preliminary injunction, “all the elements of Groene-veld’s pump are there for some practical benefit or reason.... Groeneveld has not presented its pump as in any way the equivalent of an automotive tail fin — a purely ornamental feature that contributes no demonstrable benefit to the operation or efficiency of the designed product.”
Because Groeneveld presented no evidence showing that the individual components of its grease pump or their overall configuration are nonfunctional, it failed to carry its burden of creating a triable issue of fact with respect to nonfunctionality. See Antioch Co. v. W. Trimming Corp., 347 F.3d 150, 158 (6th Cir.2003) (“[I]n order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way.... In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional.”) (citing TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 34, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001)); Leatherman Tool Grp., Inc. v. Cooper Indus., Inc., 199 F.3d 1009, 1013 (9th Cir.1999) (reversing the jury’s finding of trade-dress infringement, granting judgment as a matter of law for the defendant, and holding that “where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate ‘overall appearance’ which is non-functional”).
Groeneveld nonetheless argues that the design of its pump is nonfunctional because the particular design is not necessary for effective competition in the ALS business. This is shown, according to Groeneveld’s opening brief, by the fact that none of Groeneveld’s competitors other than Lubecore makes a similar-looking pump:
Several products compete with Groene-veld’s EP0, but none comes anywhere close to Groeneveld’s trade dress, other than the Lubecore, that looks like an exact copy of it[.] All these products have the same purpose — to pump grease — yet no other competitor found it necessary to copy Groeneveld’s trade dress.
We reject Groeneveld’s argument because adopting it would result in a rever *506 sion to the very standard that the Supreme Court unanimously rejected in TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). That case concerned the trade dress of a “dual-spring design” employed in the base of outdoor signs in order to keep them upright in strong wind conditions. Id. at 25, 121 S.Ct. 1255. Our circuit reversed the district court’s determination that the dual-spring design was functional, reasoning that “[i]t takes little imagination” to conceive of alternative workable designs. Mktg. Displays, Inc. v. TrafFix Devices, Inc., 200 F.3d 929, 940 (6th Cir.1999). This court instead held that “[t]he appropriate question is whether the particular product configuration is a competitive necessity.” Id.
But competitive necessity is an appropriate avenue of inquiry, the Supreme Court held, only in cases of “esthetic functionality,” not in cases of utilitarian functionality where a design is essential to the use or purpose of a device. TrafFix Devices, 532 U.S. at 33, 121 S.Ct. 1255. The Supreme Court then reversed this court’s decision regarding the dual-spring design, holding that the proper measure of functionality is the previously quoted “essential to the use or purpose” standard, not the competitive-necessity test:
Discussing trademarks, we have said[,] in general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article. Expanding upon the meaning of this phrase, we have observed that a functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage. The Court of Appeals in the instant case seemed to interpret this language to mean that a necessary test for functionality is “whether the particular product configuration is a competitive necessity.” 200 F.3d at 940. This was incorrect as a comprehensive definition. As explained in [Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995), and Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)], a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device.... Where the design is functional under the Inwood formulation there is no need to proceed further to consider if there is a competitive necessity for the feature.
TrafFix Devices, 532 U.S. at 32-33, 121 S.Ct. 1255 (some internal citations and some quotation marks omitted). Because the dual-spring design in TrafFix Devices accomplished the function of keeping the signs upright in strong winds, the Supreme Court held that our circuit had erred in requiring competitors to explore alternative designs (such as using three or four springs) and in finding the design to be nonfunctional. Id. at 33-34, 121 S.Ct. 1255.
TrafFix Devices makes clear that Groe-neveld’s argument about the availability of alternative grease-pump designs is misguided. The issue is not whether Lube-core could have designed a grease pump with a different appearance; the issue is whether Groeneveld’s design “is essential to the use or purpose of the article or if it affects the cost or quality of the article.” Inwood Labs., 456 U.S. at 850 n. 10, 102 S.Ct. 2182. In other words, the question is whether the overall shape of Groeneveld’s grease pump was substantially influenced by functional imperatives or preferences. See Antioch, 347 F.3d at 158 (framing the inquiry as whether “engineering necessity influenced the configuration of the functional components”). We accordingly reject Groeneveld’s invitation to drift back *507 into the error of inquiring about possible alternative designs. See id. at 157 (holding that, in light of TrafFix Devices, the district court properly rejected evidence concerning the availability of alternative scrapbook-album designs where the plaintiffs “dual strap hinge” design was functional because it held the album together and permitted the pages to lie flat).
Groeneveld next points to the testimony of Willem van der Hulst, its Vice President of Design and Production, who was involved in designing the EPO grease pump. Van der Hulst testified that Groeneveld did not “have to make its pump look this way on the inside because of the way it works on the outside.” For the reasons stated above, this testimony is insufficient to create a triable issue of fact under TrafFix Devices because it improperly focuses on the possibility of alternative designs.
Moreover, van der Hulst’s testimony was entirely conclusory — he simply asserted that Groeneveld was not limited to any particular design, but he did not explain why the chosen design was nonfunctional, and certainly did not speak with any particularity about the functional considerations that, as outlined above, apparently dictated the pump’s design. The same goes for van der Hulst’s bald assertion that the pump’s design did not “affect the way the thing performs.” See Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co., Ltd., 668 F.3d 677, 684 (9th Cir.2012) (holding that the plaintiffs evidence of nonfunction-ality was insufficient as a matter of law where, “[ejxcept for conclusory, self-serving statements, [the plaintiff] provide[d] no other evidence of fanciful design or arbitrariness”).
Groeneveld next asserts that General Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405 (6th Cir.2006), held that a company manager’s testimony about product development “was legally sufficient evidence of non-functionality.” But Lanard Toys does not stand for the proposition that the bare act of putting a manager on the stand to claim nonfunctionality is sufficient to create a triable issue of fact. If that were the law, any plaintiff could get a jury trial on the issue in question by simply mouthing the legal conclusion that its product design is nonfunctional. The holding in Lanard Toys was instead predicated on the court’s specific conclusion that the design features in question were not influenced by functional considerations. See id. at 417 (crediting the testimony of a General Motors manager to the effect that the Army’s performance specifications dictated certain elements of the Humvee’s dimensions, but not the vehicle’s “exterior appearance and styling,” including its “grille, slanted and raised hood, split windshield, rectangular doors, [and] squared edges,” elective features that did not perform any function).
Groeneveld further relies on van der Hulst’s testimony to the effect that Groe-neveld’s “commercial people” “have a finger in the pot” and “have the most power in the group.” The record is unclear as to what this testimony means and why it is relevant to the issue of nonfunctionality. There are multiple references in van der Hulst’s testimony to the so-called “commercial people,” but Groeneveld never explained the meaning of the phrase. If, as the literal meaning of the word “commercial” suggests, the “commercial people” were business executives in charge of evaluating the pump’s commercial viability, then the involvement of such individuals in developing the product design says nothing about whether or not the design is nonfunctional. The same is true if “commercial people” means managers generally. And even if “commercial people” means those in the marketing or design department, the testimony would still be unhelpful to Groeneveld. Every viable *508 mass-market product is presumably designed with marketing considerations in mind, and this unremarkable fact says nothing about whether the product design is nonfunctional.
Finally, Groeneveld points to van der Hulst’s testimony that the other grease pumps on the market look “terrible,” and that Groeneveld’s founder was “different from the really old-fashioned mechanical people” in that “he had very good choice” and “like[d] nice things,” such as “a nice office, nice cars, nice people.” Van der Hulst also testified that Groeneveld has not switched to alternative grease-pump designs, even though they might be cheaper, because the current pump is “a very nice pump” and “[everybody knows this pump.”
But these statements fail to meaningfully address the issue of nonfunctionality. The fact that Mr. Groeneveld has good taste does nothing to prove that the grease pump’s design is nonfunctional. And to the extent that van der Hulst’s testimony was intended to show that less attractive or cheaper grease-pump designs were also possible, such a showing plainly falls short under TrafFix Devices because courts should not inquire into alternative designs when the design at issue is substantially influenced by functional considerations. See TrafFix Devices, 532 U.S. at 33-34, 121 S.Ct. 1255 (“There is no need ... to engage, as did the Court of Appeals, in speculation about other design possibilities .... Here, the functionality of the spring design means that competitors need not explore whether other spring juxtapositions might be used. The dual-spring design is not an arbitrary flourish in the configuration of MDI’s product; it is the reason the device works. Other designs need not be attempted.” (internal citation omitted)).
In short, Groeneveld’s evidence was insufficient to enable a reasonable jury to find that the grease pump’s design is nonfunctional. And Groeneveld’s proof of nonfunctionality is rendered even more wanting by the fact that Lubecore has pointed to the testimony of van der Hulst and Wapenaar, Groeneveld’s own witnesses, to show that the pump’s volume, shape, and materials are all essentially influenced by the dictates of function.
This result is consonant with the public policy underlying the functionality doctrine, which is to channel the legal protection of useful designs from the realm of trademark to that of patent. Such channeling ensures that the high public costs of monopoly are not imposed without an assurance that the design satisfies the rigorous requirements of patentability, including novelty and nonobviousness, and is protected for only a limited period of time. As well stated by the Supreme Court,
[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm’s reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation. If a product’s functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).
Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 164-65, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (internal citations omitted); accord Antioch Co. v. W. Trimming Corp., 347 F.3d 150, 159-60 (6th Cir.2003).
*509 Groeneveld has no patent on the design of its grease pump. That is why it has pursued a trade-dress claim under the Lanham Act. But nonfunctionality is an indispensable element of a trade-dress claim, so Groeneveld’s failure to raise a triable issue as to whether its product design is nonfunctional is alone sufficient to require judgment as a matter of law in favor of Lubecore on this claim. We will nevertheless proceed to discuss the likelihood-of-confusion element of a trade-dress claim because it bears upon Groeneveld’s cross-appeal and further supports our resolution of this case in light of the important public-policy issues involved.
D. The likelihood of confusion
Another element that Groeneveld must prove in order to prevail on its trade-dress claim is that an ordinary consumer of grease pumps would likely be confused into thinking that the two pumps at issue were manufactured by the same company or were associated or affiliated with the same company. See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 645 (6th Cir.2002); Daddy’s Junky Music Stores, Inc. v. Big Daddy’s Family Music Ctr., 109 F.3d 275, 280 (6th Cir.1997). The appropriate benchmark for assessing the likelihood of confusion is the ordinary consumer who would consider buying the product at issue. Frisch’s Restaurant, Inc. v. Shoney’s, Inc., 759 F.2d 1261, 1266 (6th Cir. 1985) (“In assessing the similarity of two marks, it is the effect upon prospective purchasers that is important.” (brackets and internal quotation marks omitted)). And the focus is on “the typical buyer exercising ordinary caution,” Daddy’s Junky Music, 109 F.3d at 285, not “the most obtuse consumer,” Abercrombie, 280 F.3d at 648 (internal quotation marks omitted).
This court has enumerated eight factors to consider in determining whether the trade dresses of competing products present a sufficient likelihood of confusion: “(1) strength of the plaintiffs [trade dress]; (2) relatedness of the goods; (3) similarity of the [trade dresses]; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant’s intent in selecting the [trade dress]; (8) likelihood of expansion of the product lines.” Frisch’s, 759 F.2d at 1264. To create a triable issue of fact, the plaintiffs “burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue.” Abercrombie, 280 F.3d at 646 (internal quotation marks omitted).
These factors are helpful guides rather than rigid requirements, Daddy’s Junky Music, 109 F.3d at 280, with “[t]he ultimate question remain[ing] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.” Id. The Frisch factors are therefore not always weighed consistently in this court’s caselaw, and a particular factor might receive a greater or lesser weight depending on the circumstances. Accordingly, this court has sometimes resolved the question of confusion by reference to only one or a few of these factors, without inquiring into the rest. See Abercrombie, 280 F.3d at 646^47 (considering “only one of the eight factors,” namely, the similarity of the parties’ trade dresses in light of their different logos and brands, and ruling for the defendant on that basis).
In the present case, Groeneveld’s and Lubecore’s logos and trademarks appearing on their respective product designs are unmistakably different, as shown in the product photos at the beginning of this opinion. The former is green with a *510 large “G” mark and says “GROENE-VELD”; the latter is red with a maple-leaf mark and says “lubecore.” And the evidence is undisputed that the same logos appear on the parties’ sales and marketing literature. In light of such a stark visual difference in branding, no reasonable consumer would think that the two grease pumps belong to the same company. See Abercrombie, 280 F.3d at 647 (holding that, because the trademarks of Abercrom-bie & Fitch and American Eagle were displayed throughout their clothing catalogs, the catalogs’ trade dresses were, “as a matter of law, not similar”); Frisch’s, 759 F.2d at 1265 (holding that Shoney’s use of the phrase “Big Boy” in the name of its restaurants did not render the phrase confusingly similar to Frisch’s own Big Boy restaurants, in part because “[b]y emphasizing ‘Shoney’s Big Boy Restaurants,’ as it did in its advertising, Shoney’s has identified itself as the source of the services”) (emphases in original); Antioch, 347 F.3d at 160 (“Westrim’s use of its own distinctive logo, scrollwork, stickers, and face sheet provide sufficient signals to scrapbook buyers that its albums are not made by Antioch, and Antioch has not contended otherwise.”); AutoZone, Inc. v. Tandy Corp., 373 F.3d 786, 797 (6th Cir. 2004) (holding that the parties’ use of their respective “house marks” in proximity to the challenged mark “reduces the likelihood of confusion from any similarity that does exist”); see also Daddy’s Junky Music, 109 F.3d at 283 (“Similarity of marks is a factor of considerable weight.”).
This conclusion is reinforced by the fact that, at about $2,500 apiece, ALS systems are expensive industrial products that are not likely to be purchased without substantial care and research. Compare Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP, 423 F.3d 539, 549 n. 13 (6th Cir.2005), and Maker’s Mark Distillery, Inc. v. Dia-geo N. Am., Inc., 679 F.3d 410, 423 (6th Cir.2012) (noting, respectively, that purchasers of $3,000 guitars and $100 bottles of tequila likely exercise a high degree of care), with Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 413 (6th Cir. 2006), and Frisch’s, 759 F.2d at 1269 (noting, respectively, that purchasers of inexpensive toys and fast food are not likely to exercise a high degree of care).
Groeneveld does not dispute that potential purchasers of grease pumps are knowledgeable and sophisticated people. Such purchasers are therefore not likely to ignore the stark difference in labeling and mistakenly purchase a Lubecore ALS when they intend to purchase a Groene-veld ALS. As this court has stated,
when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard [of consumer confusion] is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.
Daddy’s Junky Music, 109 F.3d at 285; accord Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 213 (3d Cir.1995) (“In the case of a relatively high-priced, single-purchase article, there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.” (internal quotation marks and ellipsis omitted)).
Groeneveld argues, however, that the two pumps’ starkly different labeling would not distinguish the pumps in the eyes of their sophisticated consumers because “(1) labels are not the predominant brand identifiers in the industry; (2) corporate mergers and acquisitions are frequent, so competitor affiliations are constantly changing; (3) many pumps bear multiple company names; (4) a pump’s label does not identify who made it or *511 where it was manufactured; (5) Lubecore. is a newcomer and has no independent brand recognition; and (6) witnesses who saw the Lubecores were still confused, notwithstanding the Lubecore label.” We find none of these arguments persuasive.
Points (2) and (5) simply have no bearing on the issue of whether the pumps’ different labels are sufficient to tell them apart. Point (1) is similarly irrelevant and, in any event, is not supported by the record evidence cited by Groeneveld. The most that the cited testimony shows is that certain witnesses were able to distinguish Groeneveld’s pumps from pumps other than Lubecore’s without even looking at the labels, which says nothing about whether a consumer would be able to distinguish a Groeneveld pump from a Lube-core pump with the labels. Points (3) and (4), on the other hand, plainly do not apply to the labels at issue in the present case. Finally, point (6), which is really Groene-veld’s only relevant argument on this issue, will be discussed below under the “actual confusion” factor. The upshot is that Groeneveld has at most identified possible reasons why — hypothetically—differential branding might not be sufficient to distinguish the sources of competing products, but it did not present any evidence to show that any of those hypothetical reasons actually applies in the present ease.
We therefore conclude that the starkly different branding of the two grease pumps and the high degree of care presumably exercised by the pumps’ sophisticated consumers — factors 3 and 6 of the Frisch factors — compel the conclusion that, as a matter of law, Groeneveld has failed to carry its burden of raising a triable issue regarding the likelihood of confusion. Nevertheless, in order to give Groeneveld the benefit of all favorable inferences, we will proceed to analyze all of the Frisch factors to see whether, taken together, they would enable a reasonable jury to find for Groeneveld on this issue.

1. Lubecore’s intent in selecting the trade dress

Because Groeneveld makes Lubecore’s intent the centerpiece of its likelihood-of-confusion analysis, we will start with this factor and then proceed to the other Frisch factors. Groeneveld argues that Lubecore intended to copy Groeneveld’s trade dress (minus the label) and that this “bad intent,” for which Lubecore has offered “no innocent explanation whatsoever,” is sufficient to prove the likelihood of confusion.
The similarities in the two pumps’ appearance (excluding the labels), the fact that other manufacturers’ pumps do not have'a similar look, and the fact that Lube-core’s founder used to be a Groeneveld employee constitute circumstantial evidence of an intent to copy. But Groene-veld is mistaken about the legal significance of such copying. In particular, its assertion that the intentional copying of its trade dress constitutes “bad intent” that creates a “presumption of confusing similarity” indicates a fundamental misapprehension of the purposes of trademark law.
Groeneveld’s argument fails to appreciate that trademark law does not prohibit copying as such; that is the province of copyrights and patents. See TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 34, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (“The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity.”); Fuji Kogyo Co. v. Pac. Bay Int’l, Inc., 461 F.3d 675, 686 (6th Cir.2006) (“Trademark law cannot properly make an end run around the strict requirements of utility patent law by giving equivalent rights to exclude.” *512 (brackets and internal quotation marks omitted)).
A manufacturer who desires protection against copying must satisfy the requirements of protectability under the copyright or patent regimes and must also submit itself to the limited time periods of protection afforded under those regimes. Those requirements and their attendant restrictions incentivize valuable artistic and scientific creations while ensuring that the social costs of monopoly are contained within reasonable bounds. See U.S. Const, art. I, § 8, el. 8 (the Copyright and Patent Clause) (“The Congress shall have Power ... To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.”); Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 146-51, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (explicating the policies and tradeoffs of the patent system); Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 428-29, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (explicating the policies and tradeoffs of copyright law).
The public policy behind the patent regime is perhaps most clearly set out in Sears, Roebuck & Co. v. Stiff el Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964):
The grant of a patent is the grant of a statutory monopoly.... Patents ... are meant to encourage invention by rewarding the inventor with the right, limited to a term of years fixed by the patent, to exclude others from the use of his invention.... But in rewarding useful invention, the rights and welfare of the community must be fairly dealt with and effectually guarded. To that end the prerequisites to obtaining a patent are strictly observed, and when the patent has issued the limitations on its exercise are equally strictly enforced.... Thus the patent system is one in which uniform federal standards are carefully used to promote invention while at the same time preserving free competition.
Id. at 229-31, 84 S.Ct. 784 (internal citations and quotation marks omitted).
Trademark law’s likelihood-of-confusion requirement, in contrast, is designed to promote informational integrity in the marketplace. By ensuring that consumers are not confused about what they are buying, trademark law allows them to allocate their capital efficiently to the brands that they find most deserving. This, in turn, incentivizes manufacturers to create robust brand recognition by consistently offering good products and good services, which results in more consumer satisfaction. That is the virtuous cycle envisioned by trademark law, including its trade-dress branch. As stated in Qualitex Co. v. Jacobson Products Co., Inc., 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995):
In principle, trademark law, by preventing others from copying a source-identifying mark, reduces the customer’s costs of shopping and making purchasing decisions, for it quickly and easily assures a potential customer that this item — the item with this mark — is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product. The law thereby encourages the production of quality products, and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer’s inability quickly to evaluate the quality of an item offered for sale. It is the source-distinguishing *513 ability of a mark ... that permits it to serve these basic purposes.
Id. at 163-64, 115 S.Ct. 1300 (internal citations, quotation marks, and brackets omitted) (emphasis in original).
Such an incentive structure would of course be disrupted if a manufacturer’s hard-won brand recognition were open to appropriation by other manufacturers who confused consumers into believing that the two brands are affiliated or are one and the same. If manufacturers’ qualitative efforts were subject to such skimming off, they would have less incentive to improve their offerings and build a robust brand in the first place.
No harm is done to this incentive structure, however, by the copying of a product design that does not confuse consumers as to the product’s source. As long as a consumer can easily identify the source based on the trademark, the consumer will still be able to allocate his or her capital freely and efficiently, and manufacturers will retain the incentive to improve their offerings and solidify their brands. So trademark law, like the law of unfair competition of which it is a part, focuses not on copying per se but on confusion:
The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source. While that concern may result in the creation of ‘quasi-property rights’ in communicative symbols, the focus is on the protection of consumers, not the protection of producers as an incentive to product innovation. Judge Hand captured the distinction well in Crescent Tool Co. v. Kilbom & Bishop Co., 247 F. 299, 301 (2d Cir.1917), where he wrote: “The plaintiff has the right not to lose his customers through false representations that those are his wares which in fact are not, but he may not monopolize any design or pattern, however trifling. The defendant, on the other hand, may copy plaintiffs goods slavishly down to the minutest detail: but he may not represent himself as the plaintiff in their sale.”
Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 157, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (brackets and emphasis omitted).
That is why, in the absence of consumer confusion, and in the absence of any copyright or patent protection, copying is perfectly legal. Indeed, such copying is more than just legal; it is often beneficial:
Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. Allowing competitors to copy will have salutary effects in many instances. Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology.
TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (internal citations and quotation marks omitted); accord Bonito Boats, 489 U.S. at 156-57, 109 S.Ct. 971 (“[T]he efficient operation of the federal patent system depends upon substantially free trade in publicly known, unpatented design and utilitarian conceptions.... Both the novelty and the nonobviousness requirements of federal patent law are grounded in the notion that concepts within the public grasp, or those so obvious that they readily could be, are the tools of creation available to all. They provide the *514 baseline of free competition upon which the patent system’s incentive to creative effort depends.”); Compeo Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) (“[I]f the design is not entitled to a design patent or other federal statutory protection, then it can be copied at will.”); Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231, 84 S.Ct. 784,11 L.Ed.2d 661 (1964).
The same principle has been affirmed repeatedly by this court. See Antioch Co. v. W. Trimming Corp., 347 F.3d 150, 160 (6th Cir.2003) (“Antioch repeatedly attacks Westrim for slavishly copying the CREATIVE MEMORIES album. What Antioch fails to appreciate is that copying is not always discouraged or disfavored and can have salutary effects. Copying preserves competition, which keeps downward pressure on prices and encourages innovation.” (brackets, citations, and quotation marks omitted)); Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 640 (6th Cir.2002) (explaining that “copying preserves competition”); See also 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:19 (“[C]opying in order to imitate an unpatented functional aspect of a competitor’s product is what free competition is all about____”).
The clear import of the twin principles that copying in the absence of copyright or patent protection often serves useful purposes, and that the concern of trademark law is not about copying per se but about copying that engenders consumer confusion, is that the appropriate “intent” to focus on is not the intent to copy but rather the intent to deceive or confuse. See Maker’s Mark Distillery, Inc. v. Diageo N. Am., Inc., 679 F.3d 410, 424 (6th Cir.2012) (discussing the “inten[t] to infringe”); Daddy’s Junky Music Stores, Inc. v. Big Daddy’s Family Music Ctr., 109 F.3d 275, 286 (6th Cir.1997) (referring to the “intent of causing confusion”); Ferrari S.P.A. v. Roberts, 944 F.2d 1235, 1243 (6th Cir.1991) (asking whether the intent was “to deceive purchasers and thus derive a benefit from another’s name and reputation” or “rather to avail oneself of a design which is attractive and desirable”); Frisch’s Restaurant, Inc. v. Shoney’s, Inc., 759 F.2d 1261, 1269-70 (6th Cir.1985) (referring to “fraudulent intent” in the context of whether the defendant “acted to perpetuate any false impressions that consumers might have”).
If the law were otherwise, an act that is not only legal but also often beneficial would be transformed into evidence— or worse, as Groeneveld suggests, a “presumption” — of unlawfulness. Such an interpretation would contravene TrafFix Devices and the other decisions cited above and would subvert the fundamental purposes of trademark law. We recognize that the intent to copy might be probative in proving secondary meaning, see, e.g., Abercrombie, 280 F.3d at 639, but such intent standing alone has no bearing on the likelihood-of-eonfusion issue.
The principle that copying can have salutary effects is illustrated by the circumstances of the present case. Contrary to Groeneveld’s protestation that Lubecore’s copying of Groeneveld’s design (minus the logo) has “no innocent explanation,” the similarity serves the procompetitive purpose of signaling the existence of a competitive alternative by alerting potential consumers that the pumps might work the same because they look the same.
By making the appearance of its pump essentially the same as Groeneveld’s (other than the label), Lubecore has specifically targeted consumers who are familiar with the Groeneveld pump and offered them a competitive option. The Supreme Court has unanimously confirmed that using a functional product’s look to promote a *515 competitive offering is a procompetitive practice. See TrafFix Devices, 532 U.S. at 34, 121 S.Ct. 1255 (“If buyers are assured the product serves its purpose by seeing the operative mechanism!,] that in itself selves an important market need.”).
Lubecore’s targeting of Groeneveld’s customers would of course be unfair and anticompetitive if Lubecore masqueraded as Groeneveld and confused them about the product they were buying. But Lubecore has in fact scrupulously avoided such confusion by choosing a starkly different logo that it prominently displays on its pumps and on all its sales and marketing literature. That is why the differential labeling is critical — it transforms a practice that would otherwise be anticompetitive into one that is procompetitive. And by specifically targeting Groeneveld customers, Lubecore focuses its competitive activity on those who are most interested in such competition, thereby decreasing the consumers’ search costs and intensifying competition where it matters most. None of this is to say, of course, that consumers should switch from Groeneveld to Lubecore or that Lubecore makes a better pump. The point, rather, is that the state of affairs where consumers are aggressively courted and offered competitive options is beneficial as a matter of public policy.
These points are borne out by one of Groeneveld’s witnesses, Dean Osborn, who testified that he likes the way the Groene-veld pump works but does not particularly care who manufactures it. Therefore, when Lubecore offered him its pump as an alternative to the Groeneveld pump, he considered and ultimately bought the Lubecore pump. Osborn testified that he has been satisfied with both the Groene-veld and the Lubecore pumps that he has owned, and that he has never been confused between the two brands:
[Osborn:] [W]hat I would think is if you just, if you took off the top half of the thing and you took all the labels off of these things, take the red thing off and the black one and you take the label off here and you put that base with this off and that off and you look at the bases, to me I would not tell the difference. And to me that means I’m comfortable with the product. If it be whose product it is, I don’t care. I have a good experience with it. So I’m very comfortable with it. Whatever labels you put on it or sticker, you know, I mean it doesn’t matter. I’m looking at the mechanism that functions the grease to go to the spots where the greasing, that’s all I’m — that’s all I care about.
[Groeneveld’s Counsel:] Sir, would you have considered or bought the Lube-cores if the pump didn’t look so much like the Groeneveld pump?
[Osborn:] It made me very comfortable when it — when that looks like a Groene-veld .... The Lubecore, the comfort zone of knowing that it looks identical to it and it probably operates the same thing, they, you know, in the literature they have the blocks of where the main grease goes to the different blocks and then it goes out. Everything to me resembles the same, you know what I mean. The Lubecore and Groeneveld, they look like sister machines, okay. They look like twins. And for me making my decision on buying a greaser, that’s easy. I like these two systems. Who owns it doesn’t matter to me. I just want the grease to go to the places to where [it should go] and I want a place here to service it.
[Lubecore’s Counsel:] ... When you bought the four Lubecore systems, it was clear to you that you were buying
*516 Lubecore systems, not Groeneveld systems, correct?
[Osborn:] Correct.
[Lubecore’s Counsel:] Garvin [an independent distributor through which both parties sold their ALS systems] has told you as much himself?
[Osborn:] Um-hum, yes.
[Lubecore’s Counsel:] And the product has got Lubecore’s label on it more than one place, right?
[Osborn:] Yes.
[Lubecore’s Counsel:] And you said you were given some Lubecore marketing materials?
[Osborn:] Yes.
[Lubecore’s Counsel:] So there was no confusion on your part about whose product you were buying?
[Groeneveld’s Counsel:] Objection.
[Osborn:] Correct.
Groeneveld objects to Lubecore’s targeted competition, arguing that Lubecore’s pumps are of “diminish[ed] ... quality,” have been subject to recalls, and “have been seen leaking grease.” It also points to Lubecore’s practice of offering to extend Groeneveld’s warranty and to replace Groeneveld pumps and parts with Lube-core products.
These allegations, however, do not strengthen Groeneveld’s trade-dress claim or make Lubecore’s competition unfair. If Lubecore’s pumps are in fact inferior, all the better for Groeneveld: Consumers would soon realize the difference in quality on the clearly labeled pumps and flock to Groeneveld. But that is a business judgment to be made by consumers as they see fit, not a legal judgment to be dictated by trade-dress law. The free market, not the courts, should pick winners and losers in the business world. As stated in TrafFix Devices, 582 U.S. at 28, 121 S.Ct. 1255, “protection for trade dress exists to promote competition,” not to hinder it.
Groeneveld’s protestations against slavish copying admittedly have a certain emotional appeal and presumably swayed the jury. After all, people generally dislike copycats. But, as the foregoing discussion demonstrates, the proper application of trademark law requires us to focus our analysis not on the intent to copy the product design, but on the likelihood of consumer confusion. Evidence of Lube-core’s intent to copy Groeneveld’s product design is therefore of no help to Groene-veld. Such evidence, if anything, shows the proeompetitive benefits of Lubecore’s practices and cautions against allowing the issue to go to the jury. See Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 214,120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (discussing the desirability of “summary disposition of an anticompetitive strike suit” in the trade-dress context).

2. Strength of Groeneveld’s trade dress

This factor “focuses on the distinctiveness of a mark and its recognition among the public.” Maker’s Mark Distillery, Inc. v. Diageo N. Am., Inc., 679 F.3d 410, 419 (6th Cir.2012) (internal quotation marks omitted). Groeneveld submitted evidence of its prominence and pedigree in the industry, its extensive advertising, and, most importantly, witnesses who testified that they recognized the pump’s design and associated it with Groeneveld. This evidence is sufficient to support a factual finding that Groeneveld’s trade dress is strong. But such a finding is of no help to Groeneveld in the absence of any evidence that consumers are likely to confuse the source of the competing grease pumps.

3. Relatedness of the goods

The parties do not dispute that Groene-veld’s and Lubecore’s grease pumps perform the same function and directly com *517 pete in the industry. So this factor would also favor Groeneveld if it had any proof of the likelihood of confusion.

4. Similarity of the marks

As discussed above, the starkly different labels and trademarks on the competing products serve to dispel any likelihood of confusion between the two pumps. This factor weighs heavily against Groeneveld.

5. Evidence of actual confusion

Nothing shows the likelihood of confusion more than the fact of actual confusion. So evidence of actual consumer confusion, though not necessary, would be immensely helpful to Groeneveld. See Frisch’s Restaurant, Inc. v. Shoney’s, Inc., 759 F.2d 1261, 1267 (6th Cir.1985) (noting that evidence of actual confusion “is not necessary,” but “it is obviously the most probative proof of likelihood of confusion”); Daddy’s Junky Music Stores, Inc. v. Big Daddy’s Family Music Ctr., 109 F.3d 275, 284 (6th Cir.1997) (same).
But Groeneveld submitted no surveys showing whether a sample of the relevant consumer population was actually confused as between the parties’ products. See Frisch’s, 759 F.2d at 1267-69, and General Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 414 (6th Cir.2006), which discuss the significance of consumer surveys in showing the likelihood of confusion. Groe-neveld instead offered the testimony a single customer, Dean Osborn, in support of its actual-confusion claim. Osborn, however, unequivocally testified on cross-examination that he was not confused as to the origin of the pumps, as reflected in the transcript quoted above.
Groeneveld also cites the testimony of some of its own employees and affiliates professing “shock” and “surprise” that Lubecore’s pump “looks the same” as Groeneveld’s, saying that it “looks like a Groeneveld with a Lubecore sticker on it.” None of these witnesses, however, were consumers, and none of them were actually confused as to the origin of the two pumps. Indeed, Groeneveld admitted at oral argument that it had no evidence of actual confusion:
[Judge Gilman:] Do you have any evidence that anybody thought they were buying your client’s product when they were actually buying Lubecore’s?
[Groeneveld’s Counsel:] I don’t.
In sum, there is simply no evidence of actual confusion in the record.

6. Marketing channels used

The record contains evidence that both parties often attended the same industry trade shows, that they marketed their products over the Internet, and that certain distributors sold both parties’ ALS systems. Such, evidence is sufficient to show that there is a commonality in how the ALS systems are marketed. But, again, this evidence would be helpful to Groeneveld only if there were any showing of the likelihood of confusion.
7. Likely degree of purchaser care
As previously discussed, consumers of grease pumps are knowledgeable and sophisticated about the market, and they are unlikely to buy an expensive ALS system without exercising a substantial degree of care. This factor strongly favors Lube-core, especially when coupled with the stark dissimilarity in labeling.

8. Likelihood of market expansion

The only evidence regarding the likelihood of market expansion with respect to either company was the testimony of Eiss-es, Lubecore’s founder, that he “really would like to move into the United States,” but could not do so because of the lawsuit. This factor, however, does not alter our *518 analysis in the absence of any evidence of confusing similarity.

9. Summary of the Frisch factors

The upshot of the likelihood-of-confusion analysis is that (1) the overall trade dresses of the two pumps are dissimilar because they are distinguished by starkly different logos, (2) the sophisticated purchasers of the expensive ALS systems presumably exercise a high degree of care in making their purchases, (3) there is no evidence of actual confusion, and (4) the intent and effect of Lubecore’s choice of design is procompetitive. These Frisch factors all weigh in Lubecore’s favor. By contrast, the factors that weigh in Groeneveld’s favor (giving it the benefit of all reasonable inferences) are that (1) Groeneveld’s trade dress is strong, (2) the parties’ products are related, and (3) the parties use similar marketing channels. But these latter factors standing alone do not raise a triable issue of fact regarding the likelihood of confusion in the absence of any evidence showing that a potential consumer exercising ordinary care would confuse the grease pumps in question. In sum, no reasonable jury could conclude on the basis of the evidence before it that Groeneveld has met its burden of proving the likelihood of confusion.
E. Groeneveld’s additional trade-dress theories
Beyond the so-called “point-of-sale confusion,” which has been discussed in Part II.D. above, Groeneveld claims that the Lanham Act protects against other kinds of confusion and harm as well. The additional theories put forth by Groeneveld are (1) initial-interest confusion, and (2) dilution.

1. Initial-interest confusion

The usual focus of trademark law is on whether consumers are misled as to the source of the goods they purchase. But in certain circumstances trademark law protects against confusion even if it is ultimately dissipated before the moment of purchase. “Initial-interest confusion takes place when a manufacturer improperly uses a trademark to create initial customer interest in a product, even if the customer realizes, prior to purchase, that the product was not actually manufactured by the trademark-holder.” Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP, 423 F.3d 539, 549 (6th Cir.2005).
The following example demonstrates why protection against initial-interest confusion might make sense under the right circumstances: Suppose that you are taking a long roadtrip, you have become very hungry, and you are keeping an eye out for a McDonald’s, which is your fast-food restaurant of choice. Soon you spot a “McDonald’s” sign by an exit. You take the exit and follow the signs, looking forward to your favorite McDonald’s hamburger. But — behold—it’s a Burger King. The signs were misleading. You are not so fond of Burger King but, having already made the detour and loath to waste even more time, you reluctantly buy a Whopper and get on with your trip. See Brookfield Commc’ns, Inc. v. W. Coast Entm’t Corp., 174 F.3d 1036, 1064 (9th Cir.1999) (using a similar example with video rental stores). One does not have to be an economist to see that such a deceitful creation of an initial interest is harmful to consumer interests, brand-development incentives, and efficient allocation of capital, even if the confusion is ultimately dissipated by the time of purchase.
But the circumstances of the present case do not remotely approach those of a paradigmatic initial-interest case. To begin with, Groeneveld presented no proof as to how, in view of the two pumps’ starkly different labels and logos, there would be any initial-interest confusion at *519 all. Nor does Groeneveld explain why, assuming that such initial confusion were to take place, it would not be instantly dissipated without any harm. Simply invoking the term “initial-interest confusion” does not state a viable claim, let alone create a triable issue of fact. This court has held that alleging a hypothetical chance that a consumer might think for an instant that two products come from the same source is simply not enough:
Gibson essentially argues that the shape of the PRS guitar leads consumers standing on the far side of the room in a guitar store to believe they see Gibson guitars and walk over to examine what they soon realize are PRS guitars. We decline to adopt such a broad reading of the initial-interest-confusion doctrine. Many, if not most, consumer products will tend to appear like their competitors at a sufficient distance. Where product shapes themselves are trademarked, such a theory would prevent competitors from producing even dissimilar products which might appear, from the far end of an aisle in a warehouse store, somewhat similar to a trademarked shape.
Gibson Guitar, 423 F.3d at 552 (emphasis in original) (internal citations omitted); see also 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:9 (“Confusion means more than that the junior user’s mark merely calls to mind the senior user’s mark.” (internal quotation marks omitted)).
In the final analysis, what appears to concern Groeneveld is not so much initial-interest confusion, but initial interest, period. Groeneveld, in other words, simply does not want its customers to become interested in Lubecore as a potential competitor and possibly switch over. We cannot ascribe any other interpretation to Groeneveld’s rather startling claim that evidence of diverted sales and declining revenues, which are the normal signs of a market opening up to competition, create “a reasonable inference of confusion and its likelihood.” Groeneveld’s desire to be the only game in town is perfectly natural; most companies would hope for that status. But Groeneveld cannot get any help from trade-dress law in suppressing lawful competition. See TrafFix Devices, 532 U.S. at 28,121 S.Ct. 1255 (“[Pjrotection for trade dress exists to promote competition.”).

2. Dilution

Groeneveld’s remaining Lanham Act argument is that Lubecore is responsible for diluting the former’s brand image by introducing low-quality knockoffs into the market. Such dilution, Groeneveld argues, is harmful above and beyond the alleged harm caused by consumer confusion.
Under a dilution theory, a plaintiffs trade dress is protected against the kind of imitation that cheapens the genuine product by flooding the market with a mass of low-quality replicas, even if consumers do not ultimately confuse the fake with the real thing. See Ferrari S.P.A v. Roberts, 944 F.2d 1235, 1244-45 (6th Cir. 1991). Examples include the proliferation of fake Rolex watches or Ferrari lookalikes. See Rolex Watch, U.S.A., Inc. v. Canner, 645 F.Supp. 484 (S.D.Fla.1986); Ferrari, supra.
Trade-dress dilution is actionable under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Groeneveld’s grease-pump design, however, is neither nonfunctional nor “famous,” which are both requirements of a dilution claim under that section. Moreover, Groeneveld’s dilution claim is being raised for the first time on appeal. Neither the complaint nor the interrogatories submitted to the jury contain any references to 15 U.S.C. § 1125(c) or to a claim of dilution. Dilution is not just a new argument; it is a new cause of *520 action. We therefore decline to further consider this new claim on appeal. See Fed.R.Civ.P. 15 (setting forth the procedure to be followed in order to amend a complaint to add a new claim); Foster v. Barilow, 6 F.3d 405, 407 (6th Cir.1993) (“In general, issues not presented to the district court but raised for the first time on appeal are not properly before the court.” (brackets and internal quotation marks omitted)).
F. Trade-dress summary
In sum, because Groeneveld failed to present sufficient evidence to enable a reasonable jury to find both that Groeneveld’s product design is nonfunctional and that ordinary consumers would likely confuse its trade dress with Lubecore’s, judgment as a matter of law should have been entered for Lubecore. We therefore reverse the district court’s denial of Lubecore’s motion for judgment as a matter of law, set aside the jury’s award of damages, and dissolve the injunction.
III. ANALYSIS OF GROENEYELD’S CROSS-APPEAL
A. Other claims
We now turn to Groeneveld’s cross-appeal, which challenges the district court’s decision to grant Lubecore’s motion for judgment as a matter of law on counts 2-6 of the complaint. These counts assert claims of unfair competition and false advertising, both in violation of 11 U.S.C. § 1125(a) (Counts 2-3); deceptive trade practices, in violation of Ohio Revised Code §§ 4165.02 et seq. (Count 4); unfair competition, in violation of Ohio common law (Count 5); and unlawful interference with contractual and business relationships, again in violation of Ohio common law (Count 6). Groeneveld’s primary argument is that its non-trade-dress claims should have survived summary disposition for the same reasons that its trade-dress claim survived.
But Groeneveld’s claims of deceptive trade practices and unfair competition under the Ohio Deceptive Trade Practices Act (DTPA) and Ohio common law (Counts 4 and 5) were properly dismissed because they are coextensive with the federal trade-dress claim. See, e.g., Daddy’s Junky Music Stores, Inc. v. Big Daddy’s Family Music Ctr., 109 F.3d 275, 288 (6th Cir.1997) (holding that the plaintiffs Ohio DTPA and common-law claims “mirror the ... federal claim of trademark infringement by also requiring proof of a likelihood of confusion”). The claim of unfair competition under 15 U.S.C. § 1125(a) (Count 2) properly met the same fate because it requires proof of either a likelihood of confusion or a misdesignation of origin, neither of which exists in the present case. See Part II.D. above.
This leaves the claims of false advertising under 15 U.S.C. § 1125(a) and tortious interference under Ohio common law (Counts 3 and 6). In support of these claims, Groeneveld points to Lubecore’s “mimicking the EPO’s external appearance” and its practice of offering to extend Groeneveld’s warranty and to replace Groeneveld pumps and parts with Lube-core products.
The claim of “mimicking” has already been disposed of in the discussion of product-design copying in Part II.D.l. above. And the claim that Lubecore is at fault for targeting Groeneveld consumers is untenable. Groeneveld has cited no authority for the proposition that targeting the customers of one’s competitor by extending a warranty program or offering the replacement of parts is unlawful. Nor is such a dearth of authority surprising. After all, one company’s attempt to take customers away from another company in such a manner is the very essence of com *521 petition. Groeneveld’s claim in this respect is exactly the kind of “anticompeti-tive strike suit” that is appropriate for “summary disposition.” See Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 214, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).
B. Scope of the permanent injunction
Finally, Groeneveld urges us to broaden the scope of the district court’s permanent injunction to include Canada as well as the United States. This issue is moot because we have set aside the injunction altogether.
IV. CONCLUSION
For all of the reasons set forth above, we REVERSE the judgment of the district court denying Lubecore’s Rule 50 motion with respect to Groeneveld’s trade-dress claim, AFFIRM the district court’s dismissal of Groeneveld’s other claims, and REMAND the case with instructions to enter judgment as a matter of law in favor of Lubecore on all claims.